415 F.2d 1038
 2 Fair Empl.Prac.Cas. 67, 2 Empl. Prac. Dec.
P 10,061
UNITED STATES of America, by John N. MITCHELL, Attorney
General, Plaintiff-Appellant,
v.
HAYES INTERNATIONAL CORPORATION et al., Defendants-Appellees.
 No. 26809.
 United States Court of Appeals Fifth Circuit.
 Aug. 19, 1969.
 
 Ramsey Clark, U.S. Atty. Gen., Department of Justice, Washington, D.C., Nathan Lewin, Deputy Asst. Atty. Gen., Gary J. Greenberg, Thomas R. Ewald, Stephen J. Pollak, Attys., Dept. of Justice, Civil Rights Div., Washington, D.C., Macon L. Weaver, U.S. Atty., Birmingham, Ala., for appellant.
 Joseph F. Johnston, William F. Gardner, Drayton Nabers, Jr., Birmingham, Ala., Bernard G. Link, Baltimore, Md., John A. Fillion, Stephen I. Schlossberg, Detroit, Mich., for appellees.
 Before TUTTLE and SIMPSON, Circuit Judges, and CASSIBRY, District judge.
 TUTTLE, Circuit Judge:
 
 
 1
 On March 25, 1968, the Attorney General filed a complaint in the district court pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. 2000e-6(a).[1] The complaint alleged that the company maintained racially segregated divisions and lines of progression; discriminated in its hiring practices; and assigned whites to jobs offering higher pay, better advancement and security than similarly qualified black employees.[2] The complaint requested that the company be permanently enjoined from continuing such violations and from failing to take reasonable steps to correct the effects of past discriminatory practices.
 
 
 2
 The company repairs and rebuilds airplanes and airplane parts largely pursuant to government contracts. As of March 11, 1968 eight percent or 145 of the company's 1781 production and maintenance employees were black. The jobs in the unit were arranged in ten seniority divisions. Each division contained from one to seven lines of progression. Each line contained jobs requiring similar job skills in which the employee could normally expect to advance as he gained experience and vacancies occurred. Because some seniority divisions contained a number of lines of progression which involved similar job skills, in some cases it was possible to move laterally or upward between lines. Further, in case of layoff some employees could 'bump' less senior men in their present line as well as in related lines within the seniority division.
 
 
 3
 One hundred twenty-two of the 145 blacks were employed in two seniority divisions. Many held 'Cleaner' jobs (washing the outside of airplanes) in seniority division 7. There was but one line of progression in this division. The remainder were employed in maintenance and janitorial jobs in division 8. From a practical standpoint, there was virtually no chance to move from the lines of progression containing the predominantly black jobs into the white lines in this division.
 
 
 4
 The remaining blacks were scattered in seven of the other divisions. What their jobs were did not appear in the record. However, the company did concede that 138 of the black employees were in 'predominantly Negro' jobs.
 
 
 5
 There were 13 pay grades. Ninety-six percent of the white employees were in the seven highest grades while 77 percent of the blacks were in the three lowest grades. The company's board chairman testified that the average annual pay of 'selected' white employees was $7865 and of blacks $7117.[3]
 
 
 6
 The collective bargaining agreement gave the company broad rights to fill high level vacancies with employees who had less seniority than other employees who might also be qualified to perform the work. For example, Article IV, 17(a) provided that the company could transfer employees to any position provided only that there were no employees laid off or downgraded from the job group of the vacancy and that the person filling the vacancy was qualified.
 
 
 7
 Article IV, 6(c) also provided that in terms of layoff, an employee holding a traditionally white position in a division could bump black employees with more seniority who were holding lower level jobs in that division.
 
 
 8
 The company apparently had no formal policy of filling job vacancies from among its present black employees even if they were qualified. At least once in the past it provided black employees with limited transfer opportunities but at the cost of loss of seniority and a drop in pay. The company could and did, however, transfer white employees into vacancies ahead of more senior employees.[4] The distribution of black and white employees demonstrates that the company chose not to transfer black employees into white jobs and vice versa even though qualified blacks may have been available or could have been trained. Whatever in-service training programs were offered obviously did not provide black employees with a chance to gain the skills necessary to fill the jobs held by whites.
 
 
 9
 In short, black employees performed the lowest paid, unskilled jobs. Although the plant was operative since 1951, the company apparently was unable to recruit or train black employees to perform skilled jobs except in the most token manner. This condition remained substantially unchanged even after the effective date of Title VII of the Civil Rights Act of 1964. The black employees were segregated in their jobs in a manner which deprived them of the opportunity for advancement that white employees enjoyed.
 
 
 10
 The case in this posture never reached the court. One month after the filing of the original complaint, the Attorney General filed a motion for a preliminary injunction. This was occasioned by three significant changes at the plant. First, on March 28 the government awarded the company a contract for the repair of KC-135 jet tankers. This contract would create 740 jobs, of which 294 would not be filled by employees with transfer, promotion or recall rights. Second, on April 8, the company and union signed a new collective bargaining agreement which made some changes in the prior seniority divisions and in seniority provisions which would effect transfer, promotion, recall and layoff rights. Third, on April 12, the company instituted a transfer program which gave black employees an opportunity to transfer to some formerly white jobs.
 
 
 11
 The government contract provided a unique opportunity to provide black employees with equal employment opportunities. The collective bargaining agreement largely merged the black lines of progression with white lines but the company substantially retained its powers to transfer and promote employees as described above.
 
 
 12
 After some initial confusion, the company adequately explained the transfer program to the black employees. Each was told to fill out an application blank and designate which five from among the 57 available job titles he was interested in transferring to. They were given a week to return the forms. After the company made an offer, the employee had three days to accept. Failure to comply with either rule was a waiver of rights under the program although in practice these limitations were not strictly adhered to. Any employee who accepted a transfer had no further rights under the program.
 
 
 13
 The program made available 57 largely entry-level job title previously closed to blacks. The remainder of the company's 140 job titles were not affected.[5]
 
 
 14
 Because of the unique opportunities thus present to rectify past discriminatory practice, the Attorney General moved for a preliminary injunction. The denial of this request is the subject of this appeal.
 
 
 15
 The district court's decision largely turned on the conclusion that the transfer program did not violate Title VII.[6] The court found that the transfer program did not violate the Act because; (1) the black employees who transferred to Beginner positions in the Sheet Metal and General Mechanic lines would be promoted to permanent 'B' level jobs during the life of the KC-135 contract. They would then be protected against layoff in accordance with their plantwide seniority; (2) Remanning provisions would allow white employees to be promoted to higher level positions in the Sheet Metal and General Mechanic lines in preference to more senior black employees then at the 'B' level in those lines only in remote cases;[7] (3) those black employees who chose not to transfer did so for personal reasons, and (4) the program was fairly administered.
 
 
 16
 The United States argues that the district court's view of the case was erroneous. We agree.
 
 
 17
 The question was not whether the transfer program itself violated Title VII. The question, rather, was: In view of the prima facie case established by the government that the company was intentionally engaged in a pattern or practice of resistance to the full enjoyment of Title VII rights, did the fact that the new collective bargaining agreement and the transfer program partially corrected the violations negate the need for the preliminary injunction? That issue was not decided by the district court.
 
 
 18
 We are met initially by the company contention that the United States is now arguing an entirely new theory of the case and it should be limited to the theory that the transfer program violated Title VII.
 
 
 19
 However, we do not view the matter that way. Of course, if the United States were now setting forth new arguments on facts never presented to the trial court, the company would be correct. But its position is bottomed on the fact that after all the evidence was in and the court requested counsel for both sides to summarize their positions, government counsel concentrated on the transfer program. There is no doubt about that. But he also argued the relevance to his case of the KC-135 contract and the collective bargaining agreement. Furthermore, he was responding to a request by the trial judge to discuss but one aspect of the case: the irreparable harm requirement for issuance of a preliminary injunction.
 
 
 20
 It seems unlikely that the court was misled by the oral argument. The motion for preliminary injunction clearly set forth the government's theory as to what established the pattern or practice of resistance and the impact on that of the changed events. Furthermore, the United States sought to develop details of when the company knew about the new contract and what its job requirements would be. While it is true that the focus of the United States here is broader than adopted at oral argument, its basic position as shown by the pleadings and the conduct of the hearing is the same, albeit better defined. The district court had the whole theory before it.
 
 
 21
 The company also argues that in any case the transfer program and new collective bargaining agreement negated the need for preliminary relief because they provided the black employees with all they were entitled to under Title VII. That, of course, is the nub of the matter.
 
 
 22
 Because the case is before us in a preliminary posture, it is unwise to discuss the merits except in a limited fashion. It will be sufficient to briefly note some of the ways in which the black employees still may have been denied the 'full enjoyment' of their rights as provided by the law.
 
 
 23
 We are not pursuaded by the argument that the Company, four years after the enactment of the 1964 Civil Rights Act and three years after the effective date of Title VII of the Act, acted on its own initiative and instituted this transfer program for the sole purpose of extending to its Negro employees 'special opportunities' for transfer, training and advancement. Moreover, this Court will not be misled by the 'equal pay' or 'substantial pay' test as indicating the absence of a violation of Title VII, for Title VII of the 1964 Civil Rights Act is not an equal pay provision but an equal opportunity to the full enjoyment of employment rights.
 
 
 24
 First, the transfer program was limited in a number of ways. It covered but 57 of the 140 job classifications in the production and maintenance unit. Yet among the black employees some may have possessed the qualifications to perform jobs not on the program. Also the employees were given but one chance to transfer-- if they did not accept they were barred from further rights under the program. The company does not argue that it was administratively impossible to extend its duration. There may be nontransferring employees who now see that the company was correct when it assured them that no dire consequences would follow a transfer and who now would like to be considered.
 
 
 25
 Second, the employment statistics discussed, supra, pp. 1039, 1040 amply demonstrated a preliminary showing that the company hiring practices violated Title VII. Yet the hiring practices were not affected by the transfer program or the collective bargaining agreement.
 
 
 26
 Third, the collective bargaining agreement still gives the company unlimited power to transfer employees from one permanent position to another subject only to the limitation that there are no employees laid off or downgraded from the job in which the vacancy exists.
 
 
 27
 It is most difficult to understand why a company such as Hayes whose collective bargaining agreement gives the unlimited right to the employer to transfer its employees[8] would find a need for a 'special transfer program' for its Negro employees where the prerequisites, vacancy and qualification, under both provisions are the same. Absent any justifiable reason, which does not appear in either the appellees' brief or in the Record, the logical reason in light of all the facts presented would be race.
 
 
 28
 Fourth, although the district court found that remanning provisions would provide only the remote possibility of filling a job with a less senior white employee in preference to an equally qualified black, the finding was limited to the situation created by the transfer program. However, in other circumstances the possibility still exists that a qualified black employee would be denied a chance to fill a job because a less senior white employee had superior (remanning) rights denied the black because of race. For example, if a white employee had held a position at or near the top of a line of progression and because of race blacks had been excluded from that position (such may be the case even under the transfer program) and through remanning the white employee is in a lower rated job within the seniority division, he will fill a vacancy in the higher rated job in preference to black employees equally qualified and with more seniority even though both employees are presently performing the same job. The present preference for the white can only be explained on the basis of Hayes's long established practices of racial discrimination in employment and hence would violate Title VII.
 
 
 29
 Finally, the present application of layoff rights gained by whites but denied to blacks in the past could also result in a Title VII violation in a manner similar to that discussed above relative to the remaining problem.
 
 
 30
 Under the transfer program, a Negro employee would only be allowed to transfer if he qualified and there existed a vacancy. A vacancy would exist only after all employees with remanning rights or recall rights under the layoff pool arrangement had exercised the right or waived the right.[9]
 
 
 31
 As a practical matter, in most cases this would mean that a white employee with less seniority than a Negro employee participating in the transfer program would get first preference to jobs which neither had formerly held and for which both were equally qualified.
 
 
 32
 Thus it is clear that the transfer program and collective bargaining agreement did not provide the full vindication of the Title VII rights to which the employees were entitled.
 
 
 33
 This amply demonstrates the requisite showing that the United States would prevail on the merits. A pervasive pattern of discriminatory employment practices was demonstrated. Against this background, the transfer program and collective bargaining agreement provided only a partial correction of past illegal actions. The remaining pattern and practices remained.
 
 
 34
 The appellee chooses to believe that the 'single ultimate issue' on this appeal is whether the district court abused its discretion in not granting the appellant's motion for preliminary injunction. This contention should also be placed to rest. The trial judge should have granted the appellant's motion for preliminary injunction. It is true that this court has followed the view that an injunction does not follow as a matter of course upon either a finding or stipulation of violation of some Act of Congress. Mitchell v. Ballenger Paving Company, Inc., 299 F.2d 297, 300 (5th Cir., 1962). However, it is equally true that this court has consistently held that the decision of the lower court is subject to review and where it is clear that its discretion has not been exercised with an eye to the purpose of the Act, Wirtz v. B. B. Saxon Company, 365 F.2d 457, 462 (5th Cir., 1966); Shultz v. Parke, 413 F.2d 1364 (5th Cir., 1969), or exercised in light of the objective of the act, Mitchell v. Ballenger Paving Company, Inc., supra, we have nevertheless not hesitated to reverse an order of the trial court denying an injunction without the need of a discussion of abuse and discretion.
 
 
 35
 Where, as here, the statutory rights of employees are involved and an injunction is authorized by statute[10] and the statutory conditions are satisfied as in the facts presented here, the usual prerequisite of irreparable injury need not be established and the agency to whom the enforcement of the right has been entrusted is not required to show irreparable injury before obtaining an injunction. Fleming v. Salem Box Co., 38 F.Supp. 997, 998-999 (D.Or., 1940); Western Electric Co., Inc. v. Cinema Supplies, Inc., 80 F.2d 106, cert. den. Cinema Supplies, Inc. v. Western Electric Co., 297 U.S. 717, 56 S.Ct. 595, 80 L.Ed. 1003. We take the position that in such a case, irreparable injury should be presumed from the very fact that the statute has been violated. Whenever a qualified Negro employee is discriminatorily denied a chance to fill a position for which he is qualified and has the seniority to obtain, he suffers irreparable injury and so does the labor force of the country as a whole.
 
 
 36
 Moreover, we hold as did the court in Vogler v. McCarty, Inc., 294 F.Supp. 368, 372 (E.D.La.1967) affirmed 407 F.2d 1047 (5th Cir., 1969) that where an employer has engaged in a pattern and practice of discrimination on account of race, etc., in order to insure the full enjoyment of the rights protected by Title VII of the 1964 Civil Rights Act, affirmative and mandatory preliminary relief is required.
 
 
 37
 As the court in Quarles v. Philip Morris, Inc., 279 F.Supp. 505, 516 (E.D.Va.1968) concluded, 'Congress did not intend to freeze an entire generation of Negro employees into discriminatory patterns that existed before the Act' we add that neither did Congress intend for an entire generation of Negro employees to be given a one chance limited opportunity under the guise of 'special opportunities' to break the discriminatory pattern which migth exist at a company.
 
 
 38
 It was error to refuse to issue the preliminary injunction. The case is reversed and remanded for further proceedings not inconsistent with this opinion.
 
 
 
 [1]
 Whenever the Attorney General has reasonable cause to believe that any person or group of persons is engaged in a pattern or practice of resistance to the full enjoyment of any of the rights secured by this subchapter, and that the pattern or practice is of such a nature and is intended to deny the full exercise of the rights herein described, the Attorney General may bring a civil action * * * requesting such relief, including an application for a permanent or temporary injunction, restraining order * * *
 
 
 [2]
 42 U.S.C.A. 2000e-2 reads:
 (a) It shall be an unlawful employment practice for an employer-- (1) to * * * discriminate against any individual with respect to his compensation, terms, conditions, or his compensation, employment, because of * * * race, color * * *; or (2) to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color * * *.
 
 
 [3]
 The sample probably was unrepresentative in that it excluded supervisors and more whites were supervisors than blacks
 
 
 [4]
 White employee, Cecil Glenn, for example, held seven jobs in two years. He was promoted to an 'A' level job in the electrical field after two months with the company. He received training in a variety of jobs thereby giving him valuable remaining and layoffs rights
 
 
 [5]
 Ninety-three black employees submitted transfer requests and 47 had transferred at the time of the hearing below. Seventeen refused offers and 23 were awaiting openings. Six were medically disqualified. Of these who transferred, 18 went to General Mechanic Beginner jobs, 12 to Sheet Metal Beginner, 11 Material Handler-Stampers and the rest were scattered in various other entry-level positions
 
 
 [6]
 The court also noted that the collective bargaining agreement merged the predominantly black lines of progression into white lines. It also upgraded the wage rates of the Cleaner line of progression and broadened the recall rights of laidoff employees
 The Court also relied in a general manner on Whitfield v. United Steelworkers Local 2708, 263 F.2d 546 (5th Cir.), cert. den., 360 U.S. 902, 79 S.Ct. 1285, 3 L.Ed.2d 1254 (1959), wherein it was held that a union which in the past had negotiated discriminatory ocntracts was presently only required to cease such practices and had no obligation to remove the continuing effects of past discrimination. Whitfield was not a Title VII case and therefore is not controlling. Furthermore, to the extent that it can be read as limiting the power of courts to order 'such affirmative action as may be appropriate,' 42 U.S.C.A. 2000e-5(g), to simply barring any further application of discriminatory practices, Whitfield is inconsistent with the words of the statute, its purposes and the thrust of recent cases in this circuit. See, e.g., Local 53, Asbestos Workers, 407 F.2d 1047, 5 Cir., Jan. 15, 1969; United States v. Local 189, United Papermakers, 282 F.Supp. 39 (E.D.La.1968).
 
 
 [7]
 The court apparently referred to Art. IV, 10(a) of the collective agreement which gives first claim to a vacancy to an employee who, without regard to seniority, had been laid off or downgraded due to a work force reduction if the employees previously performed the job satisfactorily
 
 
 [8]
 The Company may transfer an employee permanently or temporarily from one job group seniority division to another, provided only that if the transfer is permanent, there are no employees laid off or downgraded from the job group to which he is being transferred. (Art. IV 17(a))
 
 
 [9]
 All employees who were on March 29, 1968 in Seniority Division VII or held jobs of Janitor, Boiler Tender, Facility Maintenance Man, Automotive Maintenance Man or Cement Finisher and Plasterer in Seniority Division VIII, as defined in the Hayes-- UAW Agreement dated April 1, 1965, shall be given, before new employees are hired, a single opportunity to transfer in accordance with their seniority to any beginning or entry level job in any Seniority Division for which they are qualified to fill vacancies in such job existing after all employees have exercised their seniority an other rights under the collective bargaining agreement. (A.98)
 
 
 [10]
 707(a) Civil Rights Act of 1964, 42 U.S.C.A. 2000e-6(a)-- The Attorney General is authorized * * * requesting such relief, including an application for a permanent or temporary injunction, restaining order or other order against the person or persons responsible for such pattern or practice, as he deems necessary to insure the full enjoyment of the rights described herein