**William S. RUTLEDGE, Plaintiff,**

v.

**ALUMINUM, BRICK AND CLAY WORKERS INTERNATIONAL UNION; Lawrence A. Holley, President of the Aluminum, Brick and Clay Workers International Union, Defendants.**

Civ. A. No. 81–C–5388–NW.

United States District Court,
N. D. Alabama,
Northwestern Division.

Dec. 18, 1981.

George C. Longshore, Birmingham, Ala., for plaintiff.

John C. Falkenberry, Birmingham, Ala., for defendants.

MEMORANDUM OF OPINION DENYING MOTION FOR PRELIMINARY INJUNCTION

CLEMON, District Judge.

The complaint in this action was filed on November 23, 1981. Plaintiff alleges that

he was transferred from one position to another in the defendant Aluminum, Brick and Clay Workers International Union ("the International") in violation of the Landrum-Griffin Act, 29 U.S.C. § 412 ("LMRDA"); and that when he protested the action of the International by picketing its offices, he was discharged in violation of the "just cause" provision of the International's Constitution.

On the same day as the complaint was filed, plaintiff moved the Court for a preliminary injunction ordering his immediate reinstatement. A hearing on this motion was held on December 3, 1981; and the matter was taken under submission upon the conclusion of the hearing.

For decision by the Court is the question of whether plaintiff has established his entitlement to a preliminary injunction in the premises.

## FACTS

For purposes of the motion for a preliminary injunction alone, the Union has stipulated that the facts averred in the complaint may be deemed accurate. The Court also heard live testimony from the plaintiff in support of the motion.

Plaintiff William S. Rutledge has been a member of the permanent staff of the Aluminum Workers International Union since 1960. Prior to that time, he was employed at Kaiser Aluminum Company's plant in Chalmette, Louisiana. While employed at Kaiser, he became a member of the Union and he has remained a union member in good standing. In 1967, plaintiff was appointed Regional Director of Region II (comprised of the southeastern states) of the International; and from that time until September, 1981, plaintiff skillfully and faithfully performed his duties as Regional Director.

Plaintiff was elected by his local union as a delegate to the 1981 Bi-annual Aluminum Workers Convention. In his capacity as a union member and as a delegate, plaintiff opposed the re-election of incumbent president Lawrence A. Holley, a defendant in this case. Plaintiff vigorously campaigned for Allan Sutherland, both before and during the Convention, openly and actively. Sutherland, like the plaintiff, was a staff member of the International at all material times during the campaign.

Holley was well aware that plaintiff was a strong supporter of Sutherland.

Notwithstanding opposition from plaintiff, Holley was re-elected in July, 1981. Following the elections, and for political reasons, Holley decided to remove plaintiff as Regional Director of Region II.

Holley first offered plaintiff the position of Wage Engineer, which plaintiff declined. Plaintiff was next offered the position of Executive Assistant to the President, which he also declined.

On September 15–16, 1981, Holley announced his staff appointments. Allan Sutherland, who had previously served as the International's Research and Education Director, was reassigned to the position of Special Assistant to the President. Coolidge Hatton was named Region II Director; and plaintiff was transferred to Region 5 (the western states) as its director. These appointments were approved by the Executive Board of the International; they were due to become effective as of September 20, 1981.

Holley knew that plaintiff did not desire a West Coast assignment. In April of 1980, Holley had appointed plaintiff as the chairman of a Trusteeship Trial Panel which was convened to hear certain charges brought against a certain local in Riverside, California. Two International vice-presidents served with plaintiff on the panel. After hearing the evidence, plaintiff wrote a report highly critical of the local's business and financial transactions. The report was concurred in by the other two panelists; and it recommended that a trusteeship be imposed on the local. The recommendation was accepted by the local. Thereafter, plaintiff received several threats on his life, based on his report. Holley was aware of the threats; and he was probably aware that plaintiff would fear for his safety in the Los Angeles area.

Holley informed plaintiff by phone on September 16 of the new assignment. He further directed plaintiff to utilize the week of September 20–27 in orienting the new Region II Director to the job. Plaintiff indicated his strong disagreement with the re-assignment and protested that it was motivated by political considerations; but he stated that he "would comply with the instructions pending federal court action." Plaintiff confirmed his understanding in a telegram to Holley.

On Monday, September 21, 1981, rather than reporting to work as he had indicated, plaintiff set up a picket line at the offices of Region II in Russellville, Alabama. After the pickets were in place, Holley (who was at the International headquarters in St. Louis) requested to speak to plaintiff by telephone. Plaintiff refused to come to the telephone, because of the picket line. Immediately after plaintiff's refusal to talk with him on the phone, Holley sent to plaintiff a telegram notifying him that he was immediately suspended, without pay, for insubordination, arising out of plaintiff's (1) refusal to orient Hatton in his new duties as Region II Director; (2) refusal to answer Holley's phone call; and (3) refusal to report to work. Plaintiff responded by telegram that he was on strike; that "ulp strikes are not grounds for suspension", and that he did not refuse to answer the phone call, rather he refused to cross a picket line.

From September 21, 1981 to the present time, plaintiff has continued to picket the regional offices of the union, assisted by other union members. Beginning in October, 1981, the International's offices in St. Louis have also been picketed on plaintiff's behalf and with his knowledge and consent.

By letter dated September 25, 1981, plaintiff was notified that his purported transfer to Region 5 had been rescinded because of his refusal to accept the assignment.

In the same letter, plaintiff was "remove[d] as an employee of the International Union," i.e., discharged. The letter cited the following basis for the discharge:

Since Monday, September 21, 1981, you have refused to perform services for the International Union and have taken actions intended to obstruct the operations of the Aluminum, Brick and Clay Workers International Union and which have subjected this International Union to public ridicule. Because of your experience, I need not tell you that this has a direct and adverse affect on our organizing efforts and collective bargaining relationships.

As stated earlier, plaintiff's picketing continues to this day.

Plaintiff filed an unfair labor practice charge against the International with the National Labor Relations Board ("NLRB"), but upon being informed that the NLRB probably lacked jurisdiction in the matter, he withdrew it.

Plaintiff personally has been injured by the discharge in three respects: he has had no income, his blood pressure has increased, and he has felt a "loss of identity". He further complains of the "chilling effect" which his discharge has had on other union members who have opposed or may oppose the president of the International.

## DISCUSSION

As a prerequisite to the issuance of a preliminary injunction requiring reinstatement, the Court must find that plaintiff has satisfied each of the following requirements: (1) irreparable injury, (2) greater harm to plaintiff if the preliminary injunction is denied than to defendants if the injunction is granted, (3) substantial probability of success on the merits, and (4) nondisservice of the public interest by the granting of the injunction. *Middleton-Keirn v. Stone*, 655 F.2d 609, 611 (5th Cir. 1981); *Clements Wire and Manufacturing Co., Inc., v. NLRB*, 589 F.2d 894, 897 (5th Cir. 1979).

In the present case, the key consideration is that of whether plaintiff has shown a substantial likelihood of success on the merits. For if plaintiff's discharge violated his right of free speech as guaranteed him by

29 U.S.C. § 411(a)(2), then plaintiff has carried the burden of establishing irreparable injury [1] as well as the burden of showing that the issuance of an injunction will not disserve the public interest.[2]

Likelihood of Success on the Merits

In the outset, it is important to point out that the discharge in this case was prompted by plaintiff's refusal to work and his picketing of the union offices—which activities on his part arose out of a politically-motivated reassignment to the West Coast. Although the reassignment has now been rescinded, the Court must consider whether plaintiff has shown a probability that he will succeed at trial in showing that (1) the International did not have a right to transfer him to the West Coast, and/or (2) his activities (i.e., striking and picketing) in protesting his reassignment were protected under the LMRDA's "Bill of Rights."

While conceding, for purposes of this motion, that plaintiff was reassigned to the West Coast for political reasons,[3] the International argues that under the authority of *Wambles v. Teamsters*, 488 F.2d 888 (5th Cir. 1974), it was empowered to effect the politically-motivated reassignment. *Wambles* and *Sewell v. IAM*, 445 F.2d 545 (5th Cir. 1971), together stand for the principle that in the absence of a provision requiring cause for discharge from appointed union office, a union employee—member who is hired for an indefinite term may be discharged by newly elected officers for political reasons. Since the Fifth Circuit has subsequently limited these cases to their facts while simultaneously recognizing that they "may eventually be controlling by analogy" in appropriate cases,[4] this Court is of the opinion that where similar facts are involved, *Wambles* and *Sewell* are still good law in the circuit. *NLRB v. Boilermakers*, 581 F.2d 473, 477 (5th Cir. 1978).

In *Sewell*, the job duties of the plaintiff, as a Grand Lodge Representative, were substantially identical to those of plaintiff in the case at bar.[5] Sewell was discharged for his opposition to a referendum which was being supported by executive council of the union. His membership status in the union was not disturbed by the discharge. The Fifth Circuit held that the union was em-

---

1. The United States Supreme Court has held that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976). While the Supreme Court has not passed on the vitality *vel non* of this principle in the Landrum-Griffin Act's "Bill of Rights" context, the lower federal courts which have considered the issue have concluded that the same general principle applies. *Maceira v. Pagan*, 649 F.2d 8, 18 (1st Cir. 1981); *Ostrowski v. Utility Workers, Local 1–2*, 104 LRRM 2343, 2348 (S.D.N.Y.1980); *Wood v. Dennis*, 489 F.2d 849, 855 (7th Cir. 1973); *Axelrod v. Stoltz*, 264 F.Supp. 536, 541 (E.D.Pa. 1967); *Gleason v. Chain Service Restaurant*, 300 F.Supp. 1241 (S.D.N.Y.,1969); *Burns v. Painters, Local 1503*, 90 LRRM 2824 (D.Conn. 1975).

The Fifth Circuit has consistently held, in the Title VII (42 U.S.C. § 2000e *et seq.*) context, that where statutory rights of an employee are involved and an injunction is authorized by statute, irreparable injury may be presumed from the very fact that the statute has been violated. *United States v. Hayes International Corp.*, 415 F.2d 1038, 1045 (5th Cir. 1969); *Culpepper v. Reynolds Metal Co.*, 421 F.2d 888

(5th Cir. 1970); *Murry v. American Standard*, 488 F.2d 529 (5th Cir. 1973); *Middleton, supra*, at 611–612.

2. Obviously, the public interest is not disserved by the issuance of an injunction which in effect requires compliance with the free speech provisions of a federal statute and which is consistent with the national labor policy as expressed by the statute.

3. The evidence adduced at the hearing indicates that Holley informed plaintiff that he was being reassigned to the West Coast because of his "experience in labor matters and in legal matters."

4. *Miller v. Holden*, 535 F.2d 912, 916 (5th Cir. 1976).

5. In his capacity as Grand Lodge Representative, "it was [Sewell's] responsibility to perform the usual functions of the union in the field; he organized and serviced the problems of the local union, handled their grievances, and negotiated their contracts. Beyond these duties it was Sewell's primary responsibility to promote and execute the policies of the Union's Executive Council and its International President..." *Id.*, at 548.

powered to discharge Sewell for insubordination under the facts of the case.[6]

In *Wambles,* the plaintiff was an assistant business manager of the local union. Wambles supported an unsuccessful candidate for Business Manager; and when the winner of the election took office, he fired both Wambles and his unsuccessful opponent (who was also an assistant business manager). Assistant business managers under the IAM Constitution served at the pleasure of the president. In upholding the discharges, Judge Pittman observed:

> "As a practical matter, the Union president should be able to work with those who will cooperate with his program and carry out his directives. * * *
>
> To extend the protection of labor's 'Bill of Rights,' ... 'Free Speech Rights' ... to such office holders would, in effect, give such officer a lifetime job except on dismissal for cause. The elected officials necessarily rely on appointed officials to implement policies and plans presumably approved by the Union membership in the election. * * *
>
> The dismissed officials worked against the election of the President, one of them ran against him, which means the President was opposed on personal grounds or policy grounds, but in either event, would create an intolerable situation for the elected official in implementing his programs on which he was elected." 488 F.2d at 889, 890.

In the case at bar, the International President is specifically empowered to "appoint ... [r]egional [d]irectors when necessary, subject to approval of the International Executive Board". These regional directors are directly responsible to the International President; and, like the other employees appointed by him, they are responsible for implementing his programs and policies. Though "just cause" is required by the International's Constitution for the *removal* of any employee; it embodies no such requirement for the *reassignment* of an employee.

The Court concludes that the principles of *Wambles* and *Sewell* are probably controlling in the case *sub judice.* Plaintiff's duties, as stated earlier, were almost identical to those of the discharged union employees in those cases. Plaintiff had no right of incumbency in the directorship of any given region.[7] By opposing the re-election of the incumbent president, plaintiff assumed the risk of reassignment in the event that his candidate lost.

Plaintiff has not therefore carried the burden of establishing a substantial probability that he will prevail on the issue of his transfer from one region to another.

Plaintiff fares no better on the discharge issue. For while it is clear that plaintiff has the right, as a union member, to picket the union as free speech, that right is subject to three general limitations.[8] Two of

---

**6.** "The rights of free expression ... may be exercised fully and freely by any member of the union; the mere fact that a member is an appointed or elected official of the union does not destroy his statutory rights. This conclusion, however, does not permit an employee who accepts employment for the performance of certain specified duties to take the largesse and pay of the union, on the one hand, and, on the other, to completely subvert the purposes of his employment by engaging in activities diametrically opposed to the performance of his specified duties. * * * All employees, whether they work for a union or a large commercial company, may be required at times to subordinate personal expression to the responsibilities of their employment. An essential and elemental ingredient of all employment is basic loyalty by employees to the employer in performing the duties of the job for which they were hired." *Id.,* at 550, 551.

**7.** The International Constitution's article setting up regional areas specifically provides: "Nothing in this article shall prevent the International President from sending International Representatives out of their own regional areas in order to serve the International Union." Constitution, Art. VII paragraph 5. The evidence does not indicate that under the Constitution, the International President has more authority over the International Representatives (whose salaries are established by the Executive Board) than his authority over the regional directors (whose salaries are presumably set by the President).

**8.** "[A] union member has the statutory right to express any views, arguments, or opinions, in-

those limitations are directly relevant here: a union's right to proscribe member conduct which interferes with its contractual and legal obligations, as well as conduct relating to the integrity of the union as an institution.

Without reaching the issue of the likely institutional damage to the International spawned by the specter of picket signs surrounding its regional and international headquarters, plaintiff's singular action in failing to report to work adversely affects the International's legal and contractual duty to provide representation for its members in Region II. For plaintiff was no mere clerical employee—he was the head of the regional office. He serviced the local unions in the region, made the staff assignments, represented the local unions in NLRB matters, and negotiated contracts. And nothing indicates that plaintiff, prior to commencing his strike and picketing activities, assigned these all-important duties to anyone else in the region or made any kind of transitional arrangements so that the union's contractual obligations would be only minimally frustrated. In this Court's preliminary balance of plaintiff's individual right of free speech as a union member, and the institutional interests of the International in fulfilling its contractual obligations, the scales tilt heavily in favor of the union [9] n. 6, *supra; Graham v. Soloner*, 220 F.Supp. 711, 714 (E.D.Pa.,1963).

Further, plaintiff's failure to talk by telephone with his supervisor, the International

President and his refusal to orient Hatton to the duties of Region II director, were acts of insubordination for which the union could lawfully discharge him. *Sewell, supra.*

Under these circumstances, plaintiff has not established a likelihood of success on the merits at a trial of his discharge claim.

Having failed to establish a likelihood of success on the merits of either of his claims, plaintiff is not entitled to a preliminary injunction.[10]

By separate order, plaintiff's request for a preliminary injunction will be denied.

---

side or outside of a union meeting, subject to only three general limitations: (1) reasonable union rules relating to the conduct of union meetings; (2) reasonable rules relating to individual responsibility to the union as an institution; and (3) reasonable rules requiring members to refrain from conduct which would interfere with the union's performance of its legal or contractual obligations." *Fulton Lodge No. 2 of IAM v. Nix*, 415 F.2d 212, 218 (5th Cir. 1969).

9. "In [the] tension between conflicting rights and duties of the union and its agents the balance to be struck depends on whether the union representative's exercise of his free speech rights may reasonably be viewed as impairing his ability to function effectively as a representative of the union's management. If

so, the union may remove him, provided he remains free as a member openly to criticize the union's leadership and its policies without reprisal. We do not believe that Congress intended Title I of LMRDA to insulate union officials, employees, or agents from removal, or to permit a union representative who disagrees with its leadership to freeze himself in office on First Amendment grounds." *Newman v. Local 1101, CWA*, 570 F.2d 439, 445 (2d Cir. 1978). The principle of *Newman* is the law of this circuit. *NLRB v. Boilermakers, supra*, 581 F.2d at 477, 480, n. 4.

10. The Court does not reach the issue of the relative harm to plaintiff and defendant in the event of the issuance or denial of a preliminary injunction.