**Sandra MOTELES, Appellee,**

v.

**UNIVERSITY OF PENNSYLVANIA and Local 506, United Plant Guard Workers of America, Appellants.**

**No. 83–1319.**

United States Court of Appeals, Third Circuit.

Argued Jan. 24, 1984.

Decided March 15, 1984.

Opinion Amended April 25, 1984.

Rehearing and Rehearing En Banc Denied April 25, 1984.

---

Kathryn H. Levering (argued), James A. Matthews, III, Drinker, Biddle & Reath, Philadelphia, Pa., for appellant The Trustees of the University of Pennsylvania.

Alice W. Ballard (argued), Anna M. Durbin, Samuel & Ballard, P.C., Philadelphia, Pa., for appellee Sandra Moteles.

Neal Goldstein (argued), Freedman & Lorry, Philadelphia, Pa., for appellant Local 506, United Plant Guard Workers of America.

Before HUNTER and WEIS, Circuit Judges, and DUMBAULD, District Judge.[*]

## OPINION OF THE COURT

WEIS, Circuit Judge.

In this Title VII case, the district court preliminarily enjoined the involuntary transfer of a female campus security officer to a less desirable shift. The court reasoned that the plaintiff had more seniority than a number of male officers and ruled that the employer's defense of a bona fide occupational qualification was irrelevant. We vacate the preliminary injunction, concluding that the plaintiff failed to show irreparable injury and that the BFOQ proffer was a proper defense.

The plaintiff filed a discrimination complaint with the EEOC against her employer, the University of Pennsylvania. She was issued a right-to-sue letter and then brought this suit seeking injunctive relief and damages. The district court granted a preliminary injunction and the defendant University has appealed.

After several rapes on campus in 1973, female students staged a "sit-in" protesting the lack of adequate security. Following negotiations, the University pledged that the next guard hired would be a woman. It also agreed to create and staff an official position designated as Female Security Specialist to promote and oversee the development of a rape victim service program.

Students again protested in 1976 because they were dissatisfied with the University's progress in fulfilling the promises made in 1973. The provost appointed a committee to assess the problem and offer solutions. In early 1977, the committee recommended measures that included assigning at least two women on each work shift of the campus police so they would be available to female students when needed or when a sexual assault occurred. One woman was to be a security officer and the other a detective. The progress in hiring and retaining female officers was also reviewed, and it was urged that, despite budget cutbacks, the number of persons on the security force be increased.

Later that year, on October 10, 1977, plaintiff Moteles began working as a security guard for the University. She was assigned to various shifts and by 1983 was working regularly on the day shift.

In 1982 two female security officers were transferred from the day shift (7:00 am—3:00 pm) to the evening (3:00 pm—11:00 pm) and night (11:00 pm—7:00 am) assignments so that each shift would have at least one woman officer. The women filed a grievance through Local 506, their collective bargaining agent. The union and the University settled the dispute. In what is called the "DuPlantis Settlement" they agreed that whenever the female-only position on a shift was vacant, the other woman officers would be given the opportunity to bid on it. If no bids were received, the opening would be filled by a woman officer through inverse seniority.

In early 1983, the female officer assigned to the evening shift was promoted to sergeant, thus creating a need for a woman during that work period. When none of the officers bid on that position, plaintiff

---

[*] The Honorable Edward Dumbauld, United States District Judge for the Western District of Pennsylvania, sitting by designation.

was transferred to that assignment effective March 14, 1983.

On February 15, 1983, before plaintiff was transferred, she filed a complaint with the EEOC alleging that the DuPlantis Settlement Agreement constituted discrimination. The complaint was referred to the Pennsylvania Human Relations Commission. At the plaintiff's request, the state commission waived jurisdiction and returned the matter to the EEOC on March 16, 1983. On that same day, the plaintiff's counsel requested the Commission to issue a right-to-sue letter. The agency did so on the following day, and plaintiff immediately filed suit in the district court.

Plaintiff began working the evening hours on March 20, 1983. However, by the time of the preliminary injunction hearing in the district court on April 4, 1983, she had already successfully bid on an opening on the night shift. When plaintiff was transferred to the evening assignment, the University had forty-one security officers. Four were women, including one trainee who was to be commissioned on April 1, 1983. Of the force's six sergeants, two were women. In the detective division two of four persons were women.

At the time the transfers were made, the University had a collective bargaining agreement with Local 506, which represented all the security officers. Article XII, section 6 of the contract provided that seniority was to be used in "shift preference ... provided the employee involved is reasonably capable of performing the work in question." At the time of her involuntary transfer, plaintiff had greater seniority than a number of the male security officers.

The district court ruled that it had jurisdiction to hear the case since the EEOC had issued plaintiff a right-to-sue letter and the agency's reasons for so doing were irrelevant. The court concluded that the University had violated the plaintiff's seniority rights and that the bona fide occupational qualification defense was "totally inapplicable to the facts as defendant presents them to be." A defense based on the contract language "reasonably capable of performing the work" was also found to be inapplicable.

As for the requisite irreparable injury, the court found that "[h]er injury is of a peculiar nature so that compensation and money cannot atone for it.... [It] is substantial and irreparable. Plaintiff is suffering injuries caused by retaliation visited upon her by University authorities while she is being asked to be the sole member of the University community to bear the brunt of the rule." The University was directed to immediately reassign plaintiff to the day shift and the union was directed to accede in that assignment. A request for a stay pending appeal was denied.

On appeal, the University contends the district court lacked jurisdiction, plaintiff failed to present evidence of irreparable harm, and the court erroneously excluded evidence on the BFOQ.

I

We first address the jurisdictional question. The University contends that because the EEOC did not attempt informal resolution of the charge before issuing plaintiff a right-to-sue letter, she has not exhausted her administrative remedies. Therefore, the University argues, the suit was premature.

Section 706(f)(1) of Title VII, 42 U.S.C. § 2000e–5(f)(1) (1976), provides that in the absence of a conciliation agreement, the Commission shall notify an aggrieved party if the agency dismisses the charge or does not file a civil action within the requisite time. That period is 180 days from either the date of the charge or the expiration of the period of reference to a state agency. On receiving notice of a right to sue, the complainant has ninety days to bring suit in the district court.

Another provision of the Act requires the EEOC to notify the employer of the charge against it, to investigate the allegations, and to either dismiss or attempt to conciliate the complaint. 42 U.S.C. § 2000e–5(b). In the case at hand, none of these steps

were taken, apparently because plaintiff thwarted any administrative activity so she could gain early resort to the district court.

As we noted in *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398 (3d Cir.1976), *cert. denied*, 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977), "Conciliation rather than formal court proceedings remains the preferred method of settling [discrimination] disputes." In establishing these procedures, Congress acted on the assumption that "[a]dministrative tribunals are better equipped to handle the complicated issues involved in employment discrimination cases." H.R.Rep. No. 238, 92d Cong., 2d Sess. 2 *reprinted in* 1972 U.S.Code Cong. & Ad.News 2137, 2146. Furthermore, "the sorting out of the complexities surrounding employment discrimination can give rise to enormous expenditure of judicial resources in already heavily overburdened Federal district courts." *Id.*

Despite Congress' declared preference for agency resolution of complaints, the EEOC has adopted a regulation permitting an aggrieved party to request a right-to-sue letter at any time before the expiration of 180 days, calculated from the date the charge is filed. The only precondition to issuance of the letter is that a designated official certify that the Commission "will be unable to complete its administrative processing of the charge" within the statutorily specified time. 29 C.F.R. § 1601.-28(a)(2) (1983).

In a thoughtful opinion, the district court in *Spencer v. Banco Real*, 87 F.R.D. 739 (S.D.N.Y.1980), found that the regulation was inconsistent with Title VII and directed that the suit be suspended, rather than dismissed, until the plaintiff completed administrative procedures before the EEOC. Other courts have differed, emphasizing the futility of requiring an individual plaintiff to idly await the passing of 180 days when the EEOC, with a huge backlog of cases, could not as a practical matter process the charge within that time. *Bryant v. California Brewers Ass'n*, 585 F.2d 421, 425 (9th Cir.1978), *vacated on other grounds*, 444 U.S. 598, 100 S.Ct. 814, 63 L.Ed.2d 55 (1980). *See also Saulsbury v. Wismer & Becker, Inc.*, 644 F.2d 1251, 1257 (9th Cir.1980). In *Milner v. National School of Health & Technology*, 409 F.Supp. 1389, 1392 (E.D.Pa.1976), the court held that since the EEOC had determined that conciliation was impossible, issuance of a right-to-sue letter 150 days after the Commission assumed jurisdiction did not preclude a suit in the district court.

Unlike those cases, the district court here ruled that the correctness of the EEOC's dismissal of administrative proceedings was immaterial. On that basis, the court rejected the defense's proffer challenging as unreasonable and unfounded the EEOC's determination that the plaintiff's charge could not be processed within the statutory period. Consequently, neither the defendant's challenge to the regulation nor the EEOC's support of it was considered.

 It may well be that the 180-day exhaustion period is not jurisdictional. *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982); *Hart v. J.T. Baker Chemical Corp.*, 598 F.2d 829 (3d Cir.1979); *cf. Occidental Life Insurance Co. v. EEOC*, 432 U.S. 355, 361, 97 S.Ct. 2447, 2451, 53 L.Ed.2d 402 (1977). Even so, premature resort to the district court should be discouraged as contrary to congressional intent. The preference for conciliation as the dispute resolution method in employment discrimination proceedings should not be undermined by a party's deliberate by-pass of administrative remedies. Accordingly, the plaintiff's actions in foreclosing EEOC conciliation efforts is one factor to be considered in determining whether equitable relief should be granted. *See Young v. International Telephone & Telegraph Co.*, 438 F.2d 757, 764 (3d Cir.1971).

Because of our disposition of the case and the incomplete record on this issue at this time, we consider it inadvisable to rule on the validity of the regulation or the procedure followed here. Since the case must be remanded to the district court in any event, further development of the fac-

tual background on this matter is in order. *See Bailey v. Delta Air Lines, Inc.*, 722 F.2d 942, 944 (1st Cir.1983).

## II

■ We have consistently held that our review of the grant or denial of preliminary injunctions is limited to determining whether there has been an abuse of discretion, an error of law, or a clear mistake in the consideration of the proof. *Rennie v. Klein*, 653 F.2d 836, 840–41 (3d Cir.1981), *vacated on other grounds*, 458 U.S. 1119, 102 S.Ct. 3506, 73 L.Ed.2d 1381 (1982); *Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir.1975). The moving party must, however, demonstrate that irreparable injury will occur unless relief maintaining the status quo is granted. *Continental Group, Inc. v. Amoco Chemicals Corp.*, 614 F.2d 351 (3d Cir.1980). We are convinced that no such injury was shown in this case.

The district court stated that it did not accept "the rationale that any clear violation of one's civil rights constitutes irreparable harm." The court correctly declined to follow the position of the Court of Appeals for the Fifth Circuit in *Middleton-Keirn v. Stone*, 655 F.2d 609 (5th Cir.1981), that irreparable harm will be presumed when private sector employees seek a preliminary injunction in Title VII employment discrimination cases. That rule was developed in cases that antedated adoption of the 1972 amendments to the Act. *See, e.g., Culpepper v. Reynolds Metals Co.*, 421 F.2d 888 (5th Cir.1970); *United States v. Hayes International Corp.*, 415 F.2d 1038 (5th Cir.1969).

We adopt the position set out in *EEOC v. Anchor Hocking Corp.*, 666 F.2d 1037 (6th Cir.1981). There, the Court of Appeals for the Sixth Circuit upheld the necessity for a showing of irreparable injury as a prerequisite for preliminary injunctive relief under Title VII. Section 706(f)(2) of the Act authorizes the EEOC to seek a preliminary injunction pursuant to Fed.R.Civ.P. 65 whenever the Commission concludes that prompt judicial action is necessary to carry out the purposes of the Act.

After a comprehensive review of the legislative history, the court observed the Senate had taken the position that no showing of irreparable injury would be required, citing *United States v. Hayes International Corp.*, 415 F.2d 1038 (5th Cir.1969). In conference, however, the Senate receded from its position. For its part, the House agreed that irreparable injury to the extent traditionally required in equity would be sufficient. After appraising this history, the Court of Appeals concluded that the traditional irreparable injury standard continued to be appropriate.

In *EEOC v. Pacific Press Publishing Ass'n.*, 535 F.2d 1182 (9th Cir.1976), the Court of Appeals held that the standard of injury would be relaxed when the Commission itself seeks relief while administrative procedures continue. But the Court observed that in "sharp contrast" private parties "must show irreparable harm to them if the injunction did not issue." *Id.* at 1187.

■ We are not presented here with special circumstances requiring preservation of the status quo established under a court order, *e.g., United States v. City of Philadelphia*, 573 F.2d 802 (3d Cir.1978),[1] or during the pendency of administrative action, *e.g., EEOC v. Pacific Press Publishing Ass'n.*, 535 F.2d 1182 (9th Cir.1976). *See Bailey v. Delta Air Lines, Inc.*, 722 F.2d 942 (1st Cir.1983). Consequently, we agree with the district court that in Title VII cases the plaintiff must establish irreparable injury as a prerequisite to the receipt of preliminary injunctive relief. *Accord, EEOC v. City of Janesville*, 630 F.2d 1254 (7th Cir.1980); *Ekanem v. Health &*

---

**1.** In *United States v. City of Philadelphia*, we could not "say that the district court erred in presuming [that] irreparable injury would result if it failed to enter a preliminary injunction." 573 F.2d at 807. But in that instance, the United States moved to enjoin the defendant's imminent appointment of all males to a police officer training class because the hiring would violate a previously issued court order.

*Hospital Corp.*, 589 F.2d 316 (7th Cir. 1978).

■ Plaintiff did not meet that burden in this case. The district court found the injury to be of a "peculiar nature" and that she was the subject of retaliation by the University. The record, however, does not support these findings. Plaintiff was on the evening shift for approximately two to three weeks. During that time her attendance at a Spanish class on Tuesday evenings was interrupted. The class also met on Thursdays, but that session coincided with the plaintiff's day off.

There is some suggestion on the record that Spanish classes were held at other hours when plaintiff could have attended despite the involuntary shift change. By the time the case came on for hearing, plaintiff may have missed two or perhaps three classes. But because of her more recent transfer to the night shift, she could attend instruction regularly.

The "retaliation" referred to by the trial judge seemingly had to do with the University's refusal to allow plaintiff to attend the Spanish classes during her work hours. The only other injury plaintiff mentioned was that her sleep habits were disturbed causing irritability that she vented on her family.

At most, the plaintiff's complaint describes an inconvenience easily compensable by damages. In *Fuller v. Highway Truck Drivers*, 228 F.Supp. 287 (E.D.Pa. 1964), *aff'd*, 428 F.2d 503 (3d Cir.1970), the plaintiffs complained of being subjected to less desirable work assignments requiring them to report for work earlier in the morning. The court determined that this inconvenience did not constitute irreparable harm and had "never been regarded as the type of damage immeasurable in dollars. Courts daily award damages for pain, suffering and far more serious inconveniences." *Id.* at 290. In *Oburn v. Shapp*, 521 F.2d 142, 151 (3d Cir.1975), this court found that the loss of benefits derived from state employment was not irreparable. *See also Glasco v. Hills*, 588 F.2d 179, 181 (3d

Cir.1977) (irreparable means more than merely serious or substantial).

In *Sampson v. Murray*, 415 U.S. 61, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974), a wrongful discharge case, the plaintiff alleged that her dismissal caused her to suffer a loss of income and damage to her reputation. The Court assumed the plaintiff could substantiate that harm but said, "we think the showing falls far short of the type of irreparable injury which is a necessary predicate to the issuance of a temporary injunction." *Id.* at 91–92, 94 S.Ct. at 953. The court also observed that insufficient savings or difficulties in immediately obtaining other employment would not constitute irreparable injury. *Id.* at 92 n. 68, 94 S.Ct. at 954.

If a discharge from employment with all of its attendant difficulties is not irreparable injury, it is obvious that the involuntary transfer to another shift amounts to nothing more than inconvenience—not enough to warrant the issuance of a preliminary injunction.

### III

■ In addition to irreparable injury, the movant must demonstrate a reasonable probability of success on the merits. *Constructors Ass'n. of Western Pennsylvania v. Kreps*, 573 F.2d 811 (3d Cir.1978); *Oburn v. Shapp*, 521 F.2d 142, 148 (3d Cir.1975); *Delaware River Port Authority v. Transamerican Trailer Transportation, Inc.*, 501 F.2d 917 (3d Cir.1974). The University's contention is that the district court in addressing this requirement erroneously excluded any evidence pertinent to the issue of the bona fide occupational qualification. Because the BFOQ defense was relevant, the district court erred in not considering it and evaluated the plaintiff's chances of ultimately prevailing under a mistaken view of the law.

Section 703(e) of Title VII, 42 U.S.C. 2000e–2(e), provides: "Notwithstanding any other provision of this subchapter, ... it shall not be an unlawful employment practice ... to hire or employ employees, [or] for a labor organization to classify its membership ..., on the basis of ... sex

... where ... sex ... is a bona fide occupational qualification reasonably necessary to the normal operation of the particular business or enterprise."

The district court recognized that the BFOQ applies in other than pure hiring situations and may exist within an organization so that "a person may be transferred out of that position or refused an opportunity to transfer into that position." However, the court determined that "[b]y no reading of the statute can one reasonably conclude that Congress decided to vitiate the seniority rights of those who meet the BFOQ requirement and allow others to retain seniority rights." The court found a distinction between "locking" a person into a position and excluding an individual from the same position. It is apparent the plaintiff's contention that her seniority rights were being violated prompted the district court to rule that the BFOQ defense was irrelevant to this case.

To avoid confusion, it is necessary to keep the concepts of BFOQ and seniority separate. At the outset, it must be understood that the BFOQ presupposes the existence of gender discrimination but nevertheless explicitly takes it outside Title VII's prohibition. *See Dothard v. Rawlinson*, 433 U.S. 321, 332–33, 97 S.Ct. 2720, 2728, 53 L.Ed.2d 786 (1977). The scope of the Title VII inquiry is limited to determining whether the discriminatory practice is not prohibited because the BFOQ operates to justify the disparate treatment.

■ If the discriminatory policy legitimated by a BFOQ defense abridges seniority rights, that deprivation of benefits poses a contractual dispute. *Tangren v. Wachenhut Services, Inc.*, 658 F.2d 705, 707 (9th Cir.1981), *cert. denied*, 456 U.S. 916, 102 S.Ct. 1771, 72 L.Ed.2d 175 (1982). Although the case at hand presents both factors, a dispute about the existence of a BFOQ may exist in the absence of any seniority rights. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

The University's policy of transferring women officers to fill vacancies designated for females only was challenged as discrimination violating Title VII. The policy admittedly discriminates on the basis of sex. But the BFOQ exception permits an employer to discriminatorily "employ" a person where the individual's sex is a qualification reasonably necessary to the normal operation of that business.

■ Operating under the BFOQ exception, an enterprise may legally exclude a person from a position either on the initial hiring or by transfer during the term of employment. *See, e.g., Fesel v. Masonic Home*, 447 F.Supp. 1346 (D.Del.1978) (hiring), *aff'd*, 591 F.2d 1334 (3d Cir.1979). *Brooks v. ACF Industries, Inc.*, 537 F.Supp. 1122 (S.D.W.Va.1982) (transfer). Nor does anything in Title VII's language preclude a decision to retain an individual in a certain job because that person is a member of a sex possessing a special qualification required in the position. Transferring or refusing to transfer within an organization are both encompassed within the meaning of "employ." The University's otherwise unlawful practice is permissible discrimination if a BFOQ exists—that is the *raison d'etre* of the exception.

■ The University asserted that the requirement for a female officer existed because of the security concerns presented by the female students and the commitments made to meet their needs. In attempting to establish the BFOQ, evidence was proffered to show the special needs of rape victims, as well as the necessity to have a female officer quickly available to assist the victim and participate in the investigation. The particular sensitivity required in rape cases was asserted as justification for selecting female rather than male officers. This evidence, clearly relevant to whether the University could show a BFOQ, should have been admitted and considered.

■ The merits of the BFOQ defense must be resolved not only to determine whether the University violated Title VII but also whether the Union acted illegally in entering into the "DuPlantis Settle-

ment." The plaintiff's seniority rights under the collective bargaining agreement are matters of contract and, in accordance with its terms, are to be determined by arbitration. The terms of a collective bargaining agreement may not violate Title VII. However, an employer may grant rights more generous than those provided by the statute. The lawfulness of the collective bargaining agreement under Title VII is determined by the court, but any dispute as to the contract's grant of seniority is to be determined by arbitration. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974).

The record reflects that the union had begun a grievance procedure at the time the hearing was held in the district court. We do not know whether the process is complete or what the award specified. This is an additional matter for clarification in the district court.

In sum, the BFOQ defense, unlike the plaintiff's contractual seniority rights, was relevant to resolution of the Title VII claim. Although both issues arise from the same factual occurrence, they are nonetheless separate. *Id.* The district court erroneously ruled that the BFOQ defense was inapplicable and should have permitted the University to present evidence material to that defense.

We conclude that the district court erred in granting the preliminary injunction because plaintiff did not demonstrate irreparable harm and the court's finding of probability of success on the merits was erroneous.

Accordingly, the order of the district court will be vacated and the case will be remanded for further proceedings consistent with this opinion.

## ·SUR PETITION FOR REHEARING

Before SEITZ, Chief Judge, GIBBONS, HUNTER, WEIS, GARTH and BECKER,

Circuit Judges,* and DUMBAULD, District Judge.**

### BY THE COURT.

The petition for rehearing filed by the appellee in the above entitled case having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied.

## STATEMENT SUR DENIAL OF REHEARING IN BANC

BECKER, Circuit Judge.

The University of Pennsylvania behaves with the best of intentions when it ministers to the special needs of rape victims and attempts to improve the security of its women students by insuring that women security guards are on duty at all times. I fear, however, that the worthiness of these goals may have enabled the University to fend off a determination of what appears to be a violation of Title VII. Specifically, I believe the panel opinion has too quickly accepted the proposition that, if womanhood is a bona fide occupational qualification for the job thrust upon Officer Moteles, that fact stands as a defense to her claim under Title VII that she was being denied the same job security rights based on seniority as her male counterparts. At least as I understand Title VII, although the bona fide occupational qualification (BFOQ) defense permits the employer to reserve a job for a woman, Title VII as a whole will not countenance the employer's decision to reserve a woman for a job, because in so doing, the employer discriminates beyond the instance where female-

---

* Judges Aldisert, Adams, Higginbotham and Sloviter did not participate in the consideration of this matter.

** The Honorable Edward Dumbauld, United States District Judge for the Western District of Pennsylvania, sitting by designation.

ness is necessary, and thus forfeits the protection of section 703(e).

As the foregoing suggests, contrary to the panel holding, I believe that the district court may well have been correct in holding that it was irrelevant whether being a woman was a BFOQ for the job assigned to Officer Moteles. A strong case can be made that, even if an employer would have a BFOQ defense in a suit brought by a man wishing to take a job that only women could perform, that fact would not allow the employer to grant job full security to men occupying gender-neutral jobs but to deny such job security to women. Instead, Title VII may well obligate the employer predicating job security on seniority and faced with a vacancy in a "woman-only" job to hire a new woman for such a job, even if this duty requires the employer to expand its workforce or, at worst, to dismiss "innocent" male employees elsewhere in its operation.[1]

A hypothetical posed by the attorneys for Officer Moteles in their petition for rehearing in banc helps expose the fundamental issues in this area—issues that I do not believe the panel opinion has adequately addressed. They write:

> Imagine, for example, that a juvenile detention facility has two job openings: one for a recreation counselor, who deals with boys and girls; and the other, for the female BFOQ position of girl's dormitory counselor. Imagine further that one man and one woman apply for the recreation counselor job and that the female applicant is qualified while the male applicant is not.
>
> Of course, Title VII would not authorize that employer to reject the female applicant in favor of the male on the basis of her sex alone. Nor, by the same token, would the statute permit a de-

fense that the man was hired in the hopes that the woman would consider taking the BFOQ job, when she had not applied for it. [Sangster v. United Air Lines, Inc., 438 F.Supp. 1221, 1229 (N.D. Cal.1977)]. Yet the panel opinion would permit such a defense, justifying the discrimination against the female applicant in the instance where she sought to be a recreation counselor, on the ground that some woman was needed to serve as a girl's dormitory counselor.

I am not certain whether the panel's opinion necessarily dictates the result suggested by Officer Moteles. First, the hypothesized woman's claim to the regular recreation counselor's job was based on "merit." Here, however, Officer Moteles' claim to the general security guard job (and against transfer to the less desirable "woman-only" security guard post) is based not on abstract "merit," but on seniority. Although the defendants here have recognized seniority as a substitute for merit in allocating employment status and privileges, sex-based employment decisions which are at variance with seniority rights may not be as inherently suspect under Title VII as those which are at variance with employment opportunities based on merit. Second, the hypothesized woman was denied employment altogether. Officer Moteles has been subjected to a somewhat lesser deprivation.[2] Nonetheless, I am hardly certain that these distinctions have much legal force and worry seriously that the panel opinion may wrongly dictate the result put forth by the petitioner for rehearing.

At the very least, I think the real issue in this case—which is whether, under the special circumstances present here, there is a "business necessity," cf. Palmer v. Gener-

---

1. Cf. W.R. Grace & Co. v. Local Union 759, International Union of the United Rubber, Cork, Linoleum & Plastic Workers, —— U.S. ——, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983) (upholding arbitration award requiring employer to compensate male employees for wages lost when they were laid off pursuant to a provision of a conciliation agreement signed with the EEOC under Title VII requiring employer to maintain its percentage of women employees in the event of layoffs).

2. Whether Officer Moteles knew of her special vulnerability to transfer when she took the job with the University of Pennsylvania would not seem to be relevant. There is no "assumption of risk" defense recognized in Title VII.

*al Mills, Inc.,* 513 F.2d 1040, 1044 (6th Cir.1975), in maintaining a system where male security guards are granted greater protection against transfer to undesirable shifts than women of equal experience—ought to be addressed by the full court.[3] I so state because in my view this case meets the requirements of our Internal Operating Procedures Chapter 8.B. for in banc hearing. I believe that the case is inconsistent with the tenor of our prior pronouncements and those of the Supreme Court on Title VII, particularly on the seniority area. I also perceive this case to be of considerable importance. I make that judgment because I believe that, as the federal courts work their way through the "second generation" Title VII cases, i.e., those dealing not with mass discrimination but with the more technical aspects of the law, the BFOQ exception and the notion of business necessity will become increasingly important. I thus think that this case should be given in banc consideration so that the contours of these doctrines might be more fully and definitively explored,[4] hence I dissent from the denial of rehearing in banc.

Circuit Judge GIBBONS joins in this statement.

---

**3.** If it were to address this issue, the court could consider the Supreme Court's decision in *Connecticut v. Teal,* 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1983). There the Supreme Court rejected·an argument that, if an overall employment policy advantages a minority group, distinct practices disadvantaging that group cannot be assailed under Title VII.

**4.** The contours of the business-necessity defense, hence of the evidence that might support it, has yet to be adequately explored in the caselaw.