Melba LACEY, Viola Sanders, Brenda Trawick, Philadelphia Welfare Rights Organization by Louise Brookins, trustee ad litem, And the Class They Seek to Represent,

v.

Walter COHEN, Secretary of Public Welfare, Gerald Radke, Deputy Secretary for Medical Assistance, Don Jose Stovall, Executive Director, Phila. County Board of Assistance, All Individually and in their Official Capacities.

Civ. A. No. 84–4236.

United States District Court,
E.D. Pennsylvania.

Nov. 5, 1984.

Richard P. Weishaupt, Philadelphia, Pa., for plaintiffs.

Maria Parisi Vickers, Deputy Atty. Gen., Com. of Pa., Philadelphia, Pa., for defendants.

## SUR PLEADINGS AND PROOF[1]

LUONGO, Chief Judge.

This is a motion for a preliminary injunction against enforcement of the Commonwealth of Pennsylvania's recently adopted requirement that medicaid recipients bear a portion of the cost of medical services. At

issue is the legality of the manner in which the Commonwealth implemented the copayment system as part of its administration of its medicaid ("MA" or "medical assistance") plan. This suit does not challenge the constitutionality or legality of the copayment program itself, nor does it attack the legislative or administrative processes by which copayment was adopted.

Plaintiffs, three individual medicaid recipients and an association of similarly situated persons, contend that the Commonwealth's advance notice of copayment to individual recipients did not comply with the due process clause of the Constitution or administrative regulations adopted pursuant to the Social Security Act. *See* 42 U.S.C. § 1396a(a)(3). Specifically, plaintiffs assert that (1) the notice failed adequately to describe the coverage and exclusions of the copayment requirement, (2) the notice did not apprise recipients of their right to a hearing to contest the correctness of application of copayment to a particular case, and (3) the Commonwealth failed to give notice of the imposition of copayment to recipients who receive their medicaid eligibility cards on a quarterly, as opposed to monthly, basis. Plaintiffs seek to enjoin further enforcement of recipient copayment until such time as the Commonwealth gives recipients clear and complete notice at least ten days before reinstitution of the cost-sharing arrangement. An evidentiary hearing was held on September 20, 25, and 26, 1984. After consideration of all the evidence, I conclude that enforcement of copayment does not subject plaintiffs to the threat of irreparable harm, and I will therefore deny the motion.

### I. *Background Findings*

Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396p, authorizes the appropriation of federal funds under the medicaid program

[f]or the purpose of enabling each State, as far as practicable under the conditions in such State, to furnish (1) medical as-

1. This memorandum constitutes findings of fact and conclusions of law as required by Fed.R. Civ.P. 52(a).

sistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and resources are insufficient to meet the costs of necessary medical services, and (2) rehabilitation and other services to help such families and individuals attain or retain capability for independence or self-care....

42 U.S.C. § 1396. Medicaid is funded jointly by the federal government and each state that elects to participate. Administration of the program rests primarily with a selected state administrative agency, here, Pennsylvania's Department of Public Welfare. *See generally Eder v. Beal*, 609 F.2d 695 (3d Cir.1979).

The individual plaintiffs in this action are persons who currently receive medical assistance as "categorically needy" persons by virtue of their eligibility for benefits under other federal programs. *See Crippen v. Kheder*, 741 F.2d 102, 103 (6th Cir. 1984); 42 C.F.R. § 435.4. Melba Lacey, who did not testify at the hearing, receives Social Security Disability Insurance Benefits and Supplemental Security Income (SSI) benefits. Viola Sanders also receives SSI benefits. Brenda Trawick and her family receive assistance under the Aid to Families with Dependent Children program (AFDC). Until September 1, 1984, these individuals were entitled to receive prescribed drugs, medical equipment, and other services covered by medical assistance without payment of any part of the fees or charges.

Defendants are Commonwealth officials whose responsibility includes administration of the copayment system. Defendant Cohen is Secretary of Pennsylvania's Department of Public Welfare ("DPW"). Defendant Radke is Deputy Secretary of DPW. Don Jose Stovall is the Executive Director of the Philadelphia County Assistance Office of DPW.

In 1982, Congress enacted the Tax Equity and Fiscal Responsibility Act (TEFRA). Pub.L. 97–248, 96 Stat. 324 (1982). In relevant portion, TEFRA increased the power of states to require recipients to share a portion of the cost of most medical assistance goods and services. S.Rep. No. 494, 97th Cong., 2d Sess. 35–36, *reprinted in* 1982 U.S. Code Cong. & Ad.News 781, 811–12; H.R.Rep. No. 760, 97th Cong., 2d Sess. 434–36, *reprinted in* 1982 U.S.Code Cong. & Ad.News 1190, 1214–16. As codified at 42 U.S.C. § 1396o, TEFRA permits states to assess recipients a nominal amount (as defined by regulations) for most covered services. Excepted from copayment by federal mandate are services rendered to individuals under 18 years of age, pregnant women, certain residents of medical institutions, and those in need of emergency services. Mandatory exceptions are also established for family planning services and services provided by a health maintenance organization. In order to prevent copayment from posing an absolute barrier to necessary medical care for those unable to pay, TEFRA also requires states that adopt such a system to deny providers the right to refuse care because of an eligible recipient's inability to pay the required portion, but it does provide that persons receiving services without copayment because of their lack of funds are indebted to the provider for the amount of the required copayment.

On August 11, 1984, the Commonwealth of Pennsylvania Department of Public Welfare published final regulations adopting a cost-sharing requirement for Pennsylvania medical assistance recipients. *See* 14 Pa. Bull. 2926–36 (Aug. 11, 1984). Hence this lawsuit.

## II. *Jurisdiction*

Plaintiffs' suit is properly before this court since they claim that defendants' alleged failure to provide recipients timely and adequate notice of copayment constituted a deprivation under color of state law of rights guaranteed by federal law or the Constitution. 42 U.S.C. § 1983; 28 U.S.C. § 1331.

## III. *The Legal Standard*

The burden of a party seeking a preliminary injunction is well-established in this circuit.

[T]he moving party must generally show (1) a reasonable probability of eventual success in the litigation and (2) that the movant will be irreparably injured *pendente lite* if relief is not granted. Moreover, while the burden rests upon the moving party to make these two requisite showings, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest."

*In re Arthur Treacher's Franchisee Litigation*, 689 F.2d 1137, 1143 (3d Cir.1982), quoting, *Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir.1975) (citations omitted). The primary considerations in this inquiry are the risk of irreparable harm to the moving party in the absence of an order maintaining the status quo, and the likelihood of success of that party's case on the merits. As the court of appeals has ruled:

> Unless both a "reasonable probability of eventual success" and "irreparable harm" are demonstrated, preliminary injunctive relief is not to be granted. *Kershner v. Mazurkiewicz*, 670 F.2d 440, 443 (3d Cir.1982) (en banc). Thus, a failure by the moving party to satisfy these prerequisites: that is, a failure to show a likelihood of success or a failure to demonstrate irreparable injury, must necessarily result in the denial of a preliminary injunction.

*In re Arthur Treacher's Franchisee Litigation*, 689 F.2d at 1143. *See also Moteles v. University of Pennsylvania*, 730 F.2d 913, 918–19 (3d Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 179, 83 L.Ed.2d 114 (1984); *Spartacus, Inc. v. Borough of McKees Rocks*, 694 F.2d 947 (3d Cir.1982); *United States v. Price*, 688 F.2d 204, 211 (3d Cir. 1982); *Doe v. Colautti*, 592 F.2d 704, 706 (3d Cir.1979); *Constructors Association of*

*Western Pennsylvania v. Kreps*, 573 F.2d 811, 814–815 (3d Cir.1978); *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–920 (3d Cir.1974). With these criteria in mind, I now turn to an evaluation of the disputed issues.

## IV. *State Action*

Defendants contend that an essential ingredient of a cause of action under 42 U.S.C. § 1983, namely state action, is lacking in this case.[2] Relying on the Supreme Court's decision in *Blum v. Yaretsky*, 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), defendants argue that this suit is an effort to hold Commonwealth officials responsible for anticipated provider abuse or misuse of the copayment system. Defendants claim that under *Blum v. Yaretsky*, such conduct cannot fairly be attributed to the Commonwealth, and that plaintiffs have therefore failed to establish the requisite state action. Because of the fundamental importance of this issue, I will deal with it at the outset.

### A.

In *Blum v. Yaretsky*, the Supreme Court ruled that the decision of a privately owned and operated nursing home summarily to discharge or transfer a patient to a lower level of care did not constitute state action under the Fourteenth Amendment. The plaintiffs in *Blum* were medicare recipients who sought to avoid involuntary discharge or transfer to less intensive levels of care without notice or an opportunity for a hearing. The plaintiffs premised their claim to the protections of due process on the high percentage of state funding of nursing homes, the extensive state regulation of such institutions, and the state's practice of adjusting recipients' medicare benefits in

---

**2.** Defendants have made written and oral presentations of the state action issue, and my description of their arguments is not intended to be exhaustive. I note that defendants' written submission on this point appears correctly to raise the question of state action as a factor to be considered in determining whether DPW should be required to provide hearings to re-

solve recipient/provider disputes over the application of copayment. *See infra* at 1024–1026. Because defendants' arguments can be interpreted as a challenge to the existence *vel non* of state action in this case, however, I conclude that a full discussion of the state action issue is required to clarify the remaining issues for final hearing.

response to a nursing home's discharge or transfer order. The Court found state action absent, reasoning that transfers initiated by the recipients' attending physicians or nursing home administrators were based on "medical judgments made by private parties according to professional standards that are not established by the State." 457 U.S. at 1008, 102 S.Ct. at 2788 (footnote omitted).

### B.

As the Supreme Court noted in *Blum v. Yaretsky*, "[f]aithful adherence to the 'state action' requirement of the Fourteenth Amendment requires careful attention to the gravamen of the plaintiff's complaint." 457 U.S. at 1003, 102 S.Ct. at 2785. To determine whether *Blum* compels a similar result in this case, therefore, it is critical to identify precisely what conduct is assailed as a violation of plaintiffs' federally guaranteed rights, and to decide whether that conduct "may fairly be said to be that of the State." *Shelley v. Kraemer*, 334 U.S. 1, 13, 68 S.Ct. 836, 842, 92 L.Ed. 1161 (1948).

Comparison of the allegations of plaintiffs' complaint with the pleading described in *Blum* establishes that the nature of plaintiffs' claim is decisively at variance with the cause of action stated in *Blum*. In *Blum*, the plaintiffs challenged nursing homes' decisions to transfer or discharge recipients without notice and a hearing. Although the plaintiffs named as defendants state officials charged with the administration of medicaid, the complaint did not challenge "particular state regulations or procedures...." 457 U.S. at 1003, 102 S.Ct. at 2785. Indeed, the plaintiffs conceded that "the decision to discharge or transfer a patient originates not with state officials, but with nursing homes that are privately owned and operated." *Id.* Thus, the Court observed "[t]heir lawsuit ... seeks to hold state officials liable for the actions of private parties, and the injunctive relief that they have obtained [in the lower courts] requires the State to adopt regulations that will prohibit the private conduct of which they complain." *Id.*

By contrast, the gravamen of the present complaint is that recipients have been deprived of their federal statutory and constitutional rights by regulations promulgated by the Commonwealth of Pennsylvania. Plaintiffs do not challenge the action of any medicaid provider in this suit; they attack the adequacy of the process by which the Commonwealth has reduced their entitlement to a government benefit in which they assert a property interest.

■ Having so characterized plaintiffs' cause of action, I conclude that there is state action with respect to the conduct now sought to be enjoined. Beyond peradventure the parties charged with deprivation of plaintiffs' rights are state actors by virtue of their public offices and their responsibility for implementing the challenged program. *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937, 102 S.Ct. 2744, 2754, 73 L.Ed.2d 482 (1982). *Cf. Rendell-Baker v. Kohn*, 457 U.S. 830, 102 S.Ct. 2764, 73 L.Ed.2d 418 (1982) (where privately operated school was not state actor, it did not act under color of state law). The inquiry thus reduces to whether the alleged deprivation is "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. at 937, 102 S.Ct. at 2754. *See also Baksalary v. Smith*, 579 F.Supp. 218, 229 (E.D.Pa.1984) (three-judge court). The answer to this question must also be in the affirmative. The gravamen of plaintiffs' complaint is that their federally guaranteed rights have been transgressed by the Commonwealth's regulations themselves. This is not a case in which state action is sought to be predicated upon a private party's utilization of a state-created right or privilege. *Cf. Lugar v. Edmondson Oil Co., Inc.* (creditor's use of prejudgment attachment procedure); *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978) (creditor's proposed sale of goods pursuant to § 7–210 of the

Uniform Commercial Code). Rather, this action attacks the legality of conduct of the State itself.

My resolution of the state action question does not imply, however, that defendants' arguments on this issue lack relevance to the resolution of this case. The Supreme Court's decision in *Blum v. Yaretsky* stands for the proposition that state action does not attach to a provider's judgment as to level of care needed by a medicaid recipient—at least where the provider's decision is not affirmatively mandated by State regulations. *Blum v. Yaretsky*, 457 U.S. at 1005, 102 S.Ct. at 2786. The absence of state responsibility for a multitude of provider decisions may affect the analysis of the question whether, on the merits, the Commonwealth must afford recipients notice and an opportunity for a hearing differently than it has thus far. This consideration, nevertheless, relates to the likely strength of plaintiffs' case on the merits, not to whether the challenged regulations are imbued with the color of state law.

## V. *Irreparable Harm*

A primary factor in deciding whether a preliminary injunction should issue is the risk of irreparable harm faced by the moving party in the absence of an order preventing such harm before trial of the case on the merits.[3] Plaintiffs argue that they face irreparable harm for two reasons: First, relying on *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), plaintiffs assert that "[a]llegations that

constitutional rights have been violated are in and of themselves a sufficient showing of irreparable injury...." Plaintiffs' Memorandum in Support of a Preliminary Injunction at 4. Second, plaintiffs contend that, given their already impoverished state, the burden of copayment will force them to economize on medically necessary services, and thus incur the risk of serious illness.

### A. *Alleged Constitutional Deprivation*

In *Elrod v. Burns*, the Supreme Court established that political patronage dismissal of most non-policymaking state employees violates the First Amendment. Affirming the Seventh Circuit Court of Appeals, the Court also ruled that the appellate court properly directed the district court to enter a preliminary injunction against further enforcement of that practice. The Supreme Court reasoned that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." 427 U.S. at 373, 96 S.Ct. at 2689.

In affirming the preliminary injunction, the *Elrod* Court relied heavily on the principle that exercise of free speech, the most fundamental political freedom, should not be hampered *or delayed* by governmental action. As the Court has long recognized, the special character of First Amendment freedoms demands that their exercise be timely in order to be effective. *Near v. Minnesota*, 283 U.S. 697, 51 S.Ct. 625, 75

---

**3.** Ordinarily it is said that the office of a preliminary injunction is to preserve the status quo pendente lite. *See, e.g., University of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834, 68 L.Ed.2d 175 (1981); *Moteles v. University of Pennsylvania*, 730 F.2d 913, 918 (3d Cir.), *cert. denied*, ___ U.S. ___, 105 S.Ct. 179, 83 L.Ed.2d 114 (1984). It is difficult to characterize plaintiffs' request for interlocutory relief as an effort to maintain the status quo. The Commonwealth implemented copayment before this suit was commenced. Moreover, a grant of a preliminary injunction in this case, coupled with the Commonwealth's likely reinstitution of copayment after a ten-day notice period, would probably render this case moot before final hearing. I recognize, of course, that the preliminary injunction is a flexible, equitable remedy, and that characterization of a particular request

for relief as mandatory or prohibitory is often difficult. *See* D. Dobbs, *Handbook on the Law of Remedies* § 2.10 at 110 (1973). In addition, as Chief Justice (then Circuit Judge) Taft observed, when a court of equity seeks to prevent irreparable harm, "it sometimes happens that the status quo is a condition not of rest, but of action, and the condition of rest is exactly what will inflict the irreparable injury upon complainant...." *Toledo, A.A. & N.M. Ry. Co. v. Pennsylvania Co.*, 54 Fed. 730, 741 (C.C.N.D. Ohio 1893). As discussed below, however, I need not decide whether plaintiffs' request for preliminary relief must satisfy the requirements of a mandatory injunction because I conclude that plaintiffs have not demonstrated a threat of irreparable harm under ordinary preliminary injunction criteria.

L.Ed. 1357 (1931); *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971) (per curiam).

Plaintiffs' reliance on *Elrod v. Burns* to establish irreparable harm in this case, however, fails to take note of the legal and factual differences between *Elrod* and the case at bar. On a factual level, the predicate for the Supreme Court's constitutional ruling in *Elrod*—that public employees were discharged by the Sheriff of Cook County, Illinois because of partisan politics—was accepted as true because of the procedural posture of that case. *See Elrod v. Burns*, 427 U.S. at 350 & n. 1, 96 S.Ct. at 2678 & n. 1. The instant case, by contrast, involves conflicting legal interpretations drawn from an incomplete factual record. *See Kershner v. Mazurkiewicz*, 670 F.2d 440, 443–44 (3d Cir.1982) (en banc) (despite allegation of constitutional deprivation, preliminary injunction properly denied where prisoners failed to demonstrate foreclosure from access to courts).

■ The legal distinction between *Elrod* and this case is of even greater significance. *Elrod* rested on the premise that, because of their special character, deprivation of First Amendment rights, without more, constitutes irreparable harm. The same cannot be said for the broad range of economic entitlements, individual or corporate, that have been accorded constitutional protection. *See, e.g., Flower Cab Company v. Petitte*, 685 F.2d 192, 195 (7th Cir. 1982) (deprivation of taxicab license). This is not to belittle the significance of the deprivation claimed by plaintiffs; the point is that they cannot establish that such harm is irreparable simply by showing that the interest they seek to vindicate is one protected by the Due Process Clause.

### B. *Threat to Recipients' Health*

Plaintiffs' claim that they are threatened with irreparable harm thus turns on an evaluation of the health risks posed by the challenged system as it currently operates.[4] Plaintiffs contend that defects in, or the absence of, advance notice of the copayment requirement establish the risk of irreparable harm. Plaintiffs also contend copayment will deter utilization of medical services, particularly by those least able to pay, and that medicaid recipients' health status is likely to deteriorate because of their failure to receive preventive care. Defendants respond that safeguards in the copayment program assure the delivery of needed care to those unable to make the nominal payment. In order to resolve this dispute I must make findings as to how copayment operates in Pennsylvania and as to the level of medical risk imposed by copayment. Then I must evaluate the harm threatened by copayment in light of the irreparable harm standard.

### 1. *Findings: Pennsylvania's Copayment System*

The Department of Public Welfare considered and adopted recipient cost-sharing in its administration of medicaid as a cost-containment measure. With a budget of $1.7 to $1.8 billion, DPW annually processes 33 to 35 million claims filed on behalf of 1.1 million recipients who receive services from 32 to 33 thousand providers. Copayment as a cost-containment device has been adopted in some form in approximately 26 states. In Pennsylvania, the program is expected to reduce medicaid expenditures by $10 million (less rebates to recipients who accumulate more than $90 in copayments in a six month period), chiefly through deterring utilization of medical services. 14 Pa.Bull. at 2933.

---

**4.** Plaintiffs concede, as they must, that the policy decision to adopt copayment is not subject to review in this court. Nevertheless, many of the arguments advanced in support of plaintiffs' claim that copayment will cause irreparable harm involve asserted health risks that were considered and rejected by the legislative bodies that authorized recipient cost-sharing. As dis-

cussed below, plaintiffs' filing of a motion for a preliminary injunction does not convert this lawsuit into a forum for judicial review of those legislative findings. To the extent plaintiffs' attempt to establish irreparable harm would require me to substitute my judgment for that of the legislatures, I reject it. *See infra* at 1021–1022.

Collection of copayments is assigned to providers. The current copayment for doctor's visits is $1, and, for pharmacy services, 50¢ for prescriptions, over-the-counter medications, and refills. For inpatient hospital services, recipients are required to contribute $3 per day to a maximum of $21 per admission. A $1 charge is imposed on diagnostic radiology, nuclear medicine, radiation therapy, and medical diagnostic services when such services are billed as to their technical component alone (the professional component is exempt), or as to the total cost of the service. For other services, the copayment varies according to the amount DPW will reimburse a provider for performing a service. Thus if the MA fee is $1 to $10, the copayment is 50¢; if the MA fee is $10.01 to $25, the copayment is $1; if the MA fee is $25.01 to $50, the copayment is $2; and if DPW will reimburse $50.01 or more, the recipient is assessed $3.

Two features of Pennsylvania's copayment plan are designed to limit the impact of the program on medicaid recipients. First, DPW calculates the amount of copayments assessed against a particular recipient every six months, and refunds to recipients any amount contributed in excess of $90. Second, in accord with Federal mandate, DPW regulations state that "No provider participating in the Program may deny covered care or services to any eligible Medical Assistance recipient because of the recipient's inability to pay the copayment amount." 14 Pa.Bull. at 2935.

Recipients confronted with a provider's refusal to furnish services because the recipient cannot make the copayment have at least two remedies: (1) The recipient can contact the local County Assistance Office for assistance in resolving a dispute, or (2) the recipient can seek needed care from other providers willing to abide by the regulation. Testimony at the hearing on plaintiffs' motion established that, at least with respect to witnesses who testified, the latter recourse was viable because sufficient providers existed in their neighborhoods.

Providers are not permitted to waive copayment or to compensate recipients for making the payment, but when they do furnish covered services without receipt of a copayment, they are entitled to enforce the unpaid amount as a debt. Because providers initially opposed the copayment system, DPW increased provider reimbursement fees by 25¢ for prescriptions, and 50¢ for visits to a physician as an additional incentive to assume the burden.

There are a number of exemptions and exceptions from the copayment requirement. Indeed, it has been estimated that 46% of Pennsylvania's MA population is exempt from the program. Groups of recipients exempt from cost-sharing include persons under 18 years of age, pregnant women, and residents of public psychiatric hospitals and certain other health care facilities. Services excepted from copayment include the following:

emergency services

laboratory services

the professional component of x-rays and certain other tests when the professional component is billed separately

family planning services and supplies

services provided by a health maintenance organization

services furnished or authorized by a health insuring organization

home health agency services

services provided in a psychiatric partial hospitalization program

funeral director services

drugs dispensed by a physician

rental of durable medical equipment

examinations requested by DPW

mileage charges when billed separately by providers

tests provided under the Early and Periodic Screening, Diagnosis and Treatment Program

outpatient services for which the MA reimbursement fee is less than $1.[5]

In addition, because DPW's analysis of copayment suggested that the program's most severe impact would be felt by recipi-

5. *See infra* at 1023.

ents affected with a few identifiable conditions, DPW exempted from copayment drugs in the following categories:

antihypertensive agents
antidiabetic agents
anticonvulsants
cardiovascular preparations
antipsychotic agents
antineoplastic agents.

Because of the wide variety of drugs used to treat the disorders targeted by DPW, the list of drugs excepted from copayment includes approximately 5,000 medications.

As presently constituted, Pennsylvania's copayment system provides two mechanisms for correction of improper copayment assessment. First, as stated in the copayment notice, individual recipients unable to resolve a dispute directly with a provider may initiate a complaint about a provider's inaccurate assessment or refusal to furnish service without a copayment at the recipient's County Assistance Office. If case workers in the County Assistance Office are unable to resolve a dispute, the matter is referred to supervisors who relay the complaint to Pennsylvania's Office of Medical Assistance. Within the Office of Medical Assistance, the Bureau of Provider Relations, which is under the supervision of Ms. Eileen Schoen, resolves disputes concerning copayment.

A second means of correction or verification of copayment charges is the remittance advice sent to providers by the Bureau of Provider Relations along with reimbursement fees. After analysis of submitted claims and copayments charged, providers are notified through the remittance advice as to the accuracy and propriety of their copayment assessments.

### 2. *Findings: Threat to Recipients' Health*

In an effort to demonstrate that copayment subjects recipients to a threat of irreparable harm, plaintiffs introduced expert testimony as to the effects of copayment both on the general class of individuals who would be affected, and specifically with respect to deinstitutionalized persons with psychiatric disorders. Also presented was the testimony of two plaintiffs and three lay witnesses.

In sum, the expert testimony verifies the Commonwealth's postulate that imposition of recipient copayment decreases the overall utilization of medicaid services. David Chavkin, an individual with extensive experience in the field of public health who is currently employed as Director of the Maryland Advocacy Unit for the Developmentally Disabled, testified as to the effects of copayment on the general recipient population. Mr. Chavkin testified that requiring individuals to meet even a nominal assessment for medically necessary goods and services forces those individuals to economize, and sometimes to forego treatment. Mr. Chavkin stated that failure to obtain treatment had been shown to have a severe impact on persons with certain disorders such as hypertension. He also noted that administering eligibility for the various exemptions to copayment, such as determining when a woman was pregnant, had proved difficult.

A serious problem with Mr. Chavkin's testimony is that many of his conclusions were based on his review of studies performed on the effects of copayment in states other than Pennsylvania. Although the copayment experience of Maryland and California may well predict that adoption of copayment in Pennsylvania will generally reduce utilization of medical services, Mr. Chavkin's testimony does not establish that cost-sharing will exacerbate the health problems of persons with specific health problems such as hypertension. Indeed, as described in the persuasive testimony of defendant Radke, Pennsylvania's program excepts from copayment drugs used to alleviate such conditions because of findings gained through the experience of other states.

Additional expert testimony was submitted by way of an affidavit from Myles T. McDonald, a social worker with experience in the area of aftercare services to deinstitutionalized psychiatric patients. Although DPW has excepted psychiatric partial hospitalization and anti-psychotic drugs

from copayment, Mr. McDonald stated that some drugs used to combat the side-effects of anti-psychotic drugs were not excepted, and that individual therapy sessions would also be subject to an assessment. He concluded that imposition of copayment would deter many such individuals from seeking treatment because many formerly institutionalized psychiatric patients turn over all but a fraction of their benefit checks to boarding house proprietors, and because such individuals are characteristically reluctant to seek even free treatment.

Plaintiffs Viola Sanders and Brenda Trawick and witnesses Louise Brookins, Ann Spyker, and Barbara Davis also testified to the effects of copayment. Viola Sanders testified that she requires periodic visits to a physician to control her hypertension. Although Ms. Sanders had not filled a prescription since the implementation of copayment, she stated that she was fearful of copayment and that she might see a physician less often.

Testimony from defendants' witness Eileen Schoen established that for Ms. Sanders, who receives $346.40 per month in SSI benefits, copayment charges would have amounted to $11 from January through June, 1983; $10.50 for the second half of 1983; and $7 for 1984 through September, 1984 had copayment been in effect during those periods.

To the same general effect was the testimony of Brenda Trawick, who suffers from various conditions including epilepsy, stomach problems, and allergies. Ms. Trawick's testimony also furnished some suggestion of provider abuse of copayment. She testified that she was refused a prescription for her child because she didn't have the money to make the copayment. It became apparent through her subsequent testimony, however, that the provider did not refuse to serve her because she was unable to pay; Ms. Trawick simply did not have the amount of the copayment on her person. She later sent her child with the money to pick up the prescription.

Had copayment been in effect as of January, 1983, Ms. Trawick, who receives $401 per month in AFDC benefits for herself and three children, would have been assessed $7.50 from January through June, 1983; $38 from July through December, 1983; $59 from January through June, 1984; and $29 from July, 1984 to September.

Illustrative testimony as to the effects of copayment on other medicaid recipients was presented by Barbara Davis and Ann Spyker. Ms. Davis, who receives $262 per month for herself and her daughter, is assessed $3 per week for methadone treatments which must be purchased in daily dosages (except Sundays' dosages which may be purchased on Saturdays). She is also to be assessed $1 per week for counseling sessions. In addition to her methadone addiction, Ms. Davis suffers from hypertension, which requires a monthly visit with a physician and some medication.

Although Ms. Davis stated that copayments for methadone treatments were to be paid in advance at the beginning of each week, she stated that she had not yet been required to make a copayment. Had copayment been in effect throughout 1984, Ms. Davis would have been assessed $19.50 in January and February, $18 in March, $18.50 in April, $19.50 in May, $20.50 in June, and $19.50 in July.

Ms. Spyker testified to the effects of copayment on her disabled 36 year old son Randall who, because of several physical and psychological problems, requires one to three nonreusable catheters per night. Although it is unclear whether Mr. Spyker's pharmacist/provider charges $10 or more for catheters of the sort used by Mr. Spyker, Ms. Spyker testified that she has been required to pay $1 per catheter. If the appropriate charge for such catheters is $10.01 or more, the copayment was properly assessed; if the correct charge for the catheters is less than $10, the copayment should have been 50¢ (or zero if the charge is $2 or less). It is unclear from the record whether the provider is charging Mr. Spyker (and DPW) the correct amount.

Mr. Spyker receives $346.40 monthly in SSI benefits. Had copayment been in ef-

fect in 1983, Mr. Spyker would have incurred $183 in copayment charges for the entire year, at least $3 of which would have been returned to him because of the $90 per six month cap on copayment charges. Subject to the cap, Mr. Spyker's assessments in 1984 through September amount to $207.

Finally, plaintiffs introduced the testimony of Louise Brookins, executive director of the Philadelphia Welfare Rights Organization. Ms. Brookins, who has been active in volunteer service for the poor since 1968 through various organizations and public agencies, stated that welfare recipients as a class lack sufficient awareness of the value of preventive medicine, and that forcing them to economize on medical care would have a negative impact, particularly on those in need of prenatal care or methadone treatment. Ms. Brookins also testified that inadequate efforts had been directed to educating recipients about preventive care and their medicaid benefits in view of the fact that few recipients could be expected to read the various inserts included with the monthly benefit check.

### 3. Discussion: Irreparable Harm

■ After consideration of all the evidence, I conclude that the current operation of Pennsylvania's copayment system does not pose a danger of irreparable harm to plaintiffs.

#### a. Medical Care For Those Unable To Pay

Foremost among all the considerations brought to my attention is that under the Commonwealth's program, medicaid recipients may not be denied medical services because of their inability to pay. This case is therefore clearly distinguishable from Becker v. Toia, 439 F.Supp. 324 (S.D.N.Y. 1977), a case in which New York's copayment plan was preliminarily enjoined. The court there found that recipients "totally without funds" would be unable to purchase medically necessary drugs. 439 F.Supp. at 336. I cannot make such a finding here. DPW regulations, in accord with federal law, mandate that providers furnish services to recipients who cannot afford the copayment. That requirement has been publicized in notices sent to both recipients and providers. Plaintiffs have produced scant evidence of provider refusal to abide by this regulation, and I am unwilling to assume that providers as a class will risk discharge from the medicaid program because of failure to comply. Medicaid recipients confronted with a provider's initial refusal to furnish services may enlist the assistance of their County Assistance Office to notify recalcitrant providers of their obligation to furnish services without copayment and of the penalties for refusal to do so. Moreover, with few exceptions[6] recipients are free to seek medically necessary services from alternative providers who are willing to comply with DPW regulations.

In short, issuance of a preliminary injunction is not warranted on the ground that plaintiffs are in jeopardy of deprivation of needed medical care. Pennsylvania's system of copayment requires providers to provide treatment to those unable to pay. Plaintiffs have not established that providers are refusing—or that they are likely to refuse—care, in violation of that regulation.

#### b. Harm Due To Improper Assessment

A second possible basis upon which to predicate a finding of irreparable harm involves the prejudice likely to be suffered by any recipients because of defects in DPW's notice regarding the copayment plan. Stated differently, plaintiffs' contention is that various defects in the copayment notice may cause some recipients to be denied medical goods and services to which they are entitled without copayment. Such erroneous application of copayment and the resultant deterrence of the use of

---

**6.** There is a group of approximately 2,000 recipients who are "locked in" to a particular provider because of past abuse of the system. Even as to this class, however, I conclude that irreparable harm has not been demonstrated in the absence of evidence that providers are refusing to follow DPW regulations.

such goods and services, plaintiffs contend, demonstrates irreparable harm.

After consideration of the evidence presented, I conclude that the possibility of erroneous application of copayment does not expose recipients to the risk of irreparable harm. As discussed in the preceding section, the Commonwealth's program does not threaten deprivation of needed care; whether an assessment is made correctly or incorrectly, a provider may not use the absence of a copayment to bar treatment of those unable to afford the charge. The burden of erroneous application of copayment is thus financial. Such an injury can be amply compensated through refund of the amount wrongfully charged, or, for those recipients whose inability to pay entitles them to services without immediate payment, by permitting such recipients to challenge the application of copayment in subsequent actions to enforce copayment debts.

Moreover, the risk of erroneous application of copayment must also be evaluated in terms of the *degree* of risk threatened by the current program. Contrary to plaintiffs' contentions, I conclude that the notice furnished recipients by DPW adequately describes the coverage and exclusions of the copayment requirement. With the assistance of providers, County Assistance Office workers, and a toll-free telephone link between providers and DPW's Bureau of Provider Relations, recipients generally are able to determine the application of copayment to the medical care which they need.

As should be expected during the initial stages of structural changes in a program such as medicaid, however, there will likely be some disputes as to the proper application of the copayment requirement. For this reason, I may well conclude on final hearing that the Commonwealth is obligated to provide recipients the opportunity for a "fair hearing" with respect to disputes as to the application of copayment for particular services. The testimony of Ms. Spyker and Ms. Davis is relevant in this regard. Although DPW maintains that the copay-

ments charged Mr. Spyker and Ms. Davis are accurate, it is not inconceivable that an administrative investigation would reveal that the provider of Mr. Spyker's catheters has been charging the recipient and DPW improperly. Ms. Davis' case is somewhat different. DPW has made a policy decision that daily administrations of methadone are to be treated as separate prescriptions, each subject to the copayment. Assuming that establishment of such a policy is within DPW's power—and plaintiffs have not challenged DPW's power to do so—an administrative body bound to apply DPW regulations would be required to sustain the assessment.

Nevertheless, the risk that some recipients will be incorrectly assessed copayments by some providers does not, without more, demonstrate irreparable harm. As stated in DPW's copayment notice, recipients can seek assistance from the County Assistance Office for disputes with providers. Further, the recipient can use the services of other providers with an accurate understanding of the copayment application. In any event, recipients unable to make the copayment can obtain services without meeting the assessment, and they can contest the accuracy of the charge if the provider seeks to enforce the debt.

### c. *Impact of Copayment Generally*

Plaintiffs' final argument on the issue of irreparable harm centers on what they predict will be the effect of the copayment system on medical assistance recipients as a class. In this aspect of the case, plaintiffs do not base their claim of irreparable harm on the likelihood of improper application of copayment as a result of defects in the Commonwealth's notice. They argue that the probable effect—indeed the objective—of copayment is to reduce utilization of medical care by medicaid recipients. From this premise, plaintiffs contend that, because of the poverty of medicaid recipients, many individuals will forego needed medical treatment, and risk serious medical illness.

After careful consideration of all the evidence, I conclude that this argument must

be rejected. Plaintiffs' attempt to establish as irreparable harm the effects of properly applied recipient copayment in effect seeks review of the decisions of Congress and the Department of Public Welfare (acting on authority delegated by the General Assembly) to implement such a program. The basic harm of which plaintiffs complain is precisely that deterrence to the use of medical services which was foreseen, and intended, by the legislative bodies that authorized copayment. For me to conclude that the generalized reduction in benefits attendant to the adoption of copayment constitutes a harm which, after balancing the interests of DPW and the public welfare, should be enjoined, would require me to upset the legislative allocation of scarce financial resources among competing social needs. This is not an appropriate judicial function.

Even were I to accept plaintiffs' invitation to review the wisdom of copayment, however, I could not conclude from the current record that sufficient proof of irreparable harm has been presented. In this respect, plaintiffs' prediction of irreparable harm challenges DPW's position that the Commonwealth's system of copayment does not impose serious health risks on medicaid recipients. Plaintiffs thus bear the burden of proving DPW in error. A review of the evidence establishes that plaintiffs have not carried their burden.

As previously noted, plaintiffs' expert witnesses testified that copayment would generally reduce recipient utilization of medical services. Expert testimony also established that adoption of copayment by other states had been associated with deteriorated health status among recipients with high blood pressure and hypertension, and that some increase in heart problems was noted. Additionally, copayment could be expected to deter formerly institutionalized psychiatric patients from seeking treatment if it were applied to them.

Perhaps because of their unfamiliarity with *Pennsylvania's* system of copayment, however, plaintiffs' experts failed to demonstrate that DPW's exemption of services

and drugs for recipients with such conditions would not prevent the health problems experienced in other states. Indeed, I find that the testimony of plaintiffs' experts was effectively rebutted by defendant Radke, who explained that the exceptions for prescription drugs in certain categories and for psychiatric partial hospitalization services were designed specifically to avoid problems of the sort identified in the published analyses of other states' copayment programs.

Nor am I convinced by the testimony of the plaintiffs or the lay witnesses that copayment threatens irreparable injury. Although it was conceded by defendants at the beginning of the hearing that cost-sharing will have some impact on plaintiffs, it has not been established, particularly in view of the protection for those unable to pay, that copayment will prevent plaintiffs from obtaining necessary medical care.

### VI. *Likelihood of Success on the Merits*

Since I have concluded that continued enforcement of the copayment requirement does not subject recipients to risk of irreparable harm, the following discussion is, strictly speaking, unnecessary. However, in order to clarify the essential issues in advance of final hearing, I will briefly discuss the parties' contentions and their relative legal merit.

Plaintiffs advance three grounds for relief in their case on the merits. Plaintiffs argue (A) that the notice distributed to recipients in advance of the imposition of copayment was vague and confusing, and that it thus failed to apprise recipients of the coverage and exclusions of the copayment requirement, (B) that the notice was defective because it failed to inform recipients of their right to a fair hearing to contest the correctness of application of copayment in a particular case, and (C) that many recipients received no notice because DPW provided notice only to the category of recipients who received medicaid eligibility cards in August, 1984. Defendants respond that the notice was both timely and adequate, and that recipients have no right

to a hearing to contest application of copayment.

## A. *Vagueness*

■ After consideration of the copayment notice and the operation of Pennsylvania's cost-sharing program, I conclude that the notice adequately informs recipients about the copayment system. The two-page document sent to recipients states, in comprehensible terms, the reason and the statutory authority for the institution of copayment, the charges that will be imposed on services, and the limit on aggregate copayment charges. Also included in the notice are instructions for resolution of disputes with providers and information as to a recipient's right to service without a copayment in cases where the recipient cannot meet the assessment. Finally, the notice lists three categories of persons who are exempt from copayment and fifteen goods and services excepted from the requirement.

Although the notice does not provide an answer to every conceivable dispute that might arise in the application of copayment, it certainly puts recipients on notice of the imposition of the requirement, and enables recipients to adjust to the change in their benefits. *Rochester v. Baganz,* 479 F.2d 603 (3d Cir.1973). The notice adequately describes the coverage and exclusions of copayment in a manner that is most likely to be read and understood by all recipients. *See Potter v. James,* 499 F.Supp. 607, 614 (M.D.Ala.1980).

Plaintiffs contend that DPW failed to provide adequate notice because it did not furnish providers the list of drugs excepted from cost-sharing. The evidence does not support this contention. It is clear that, since the beginning of copayment, providers have had toll-free telephone access to the Bureau of Provider Relations during regular business hours to determine whether a specific medication was excepted from copayment. In addition, the list of excluded drugs was mailed to local County Assistance Offices on August 31, 1984, and recipients were notified that the local offices would have such information. Finally, from the beginning of copayment until the date of the hearing, approximately 200 copies of the drug list and 900 microfiche editions had been distributed to providers, some to large chain organizations that are expected to key such information into their computers. Thus, the evidence simply does not establish that DPW has failed to make reasonably available the list of drugs for which copayment would not be required.

Plaintiffs were able to raise some question as to the completeness of the notice in two respects: First, prior to the implementation of copayment, but after the recipient notice was printed, DPW changed the exception from copayment for services costing less than $1 to one for services costing less than $2. Second, although final regulations published in the Pennsylvania Bulletin exempt only long-term residents of medical institutions who are required to spend all but a minimum amount of their income for medical care costs, the recipient notice and DPW policy also allow exemption of short-term residents. These "defects" in the notice do not convince me that plaintiffs are likely to succeed on the merits of their claim. The latter defect is not a defect at all, but an accurate statement of DPW policy. The former error, an inaccurate statement of the minimum MA fee which will result in the imposition of a copayment, is simply an insufficient basis for enjoining the entire copayment program.

## B. *Right to a Hearing*

Plaintiffs assert that the notice should have apprised recipients of a right to a hearing to contest the correctness of application of copayment in particular cases.[7] To demonstrate that the notice was defec-

---

7. If the regulations require a fair hearing, plaintiffs are entitled to notice of that fact. The regulations require notification of the right to a hearing at the time an individual applies for medicaid and at the time of any action affecting a recipient's claim. 42 C.F.R. § 431.206(b)(1), (c)(1) and (2). As noted in the preceding section, DPW's adoption of copayment is such an "action" with respect to recipients against whom copayment is to be applied. *See* 42 C.F.R. § 431.201.

tive on this basis, plaintiffs assert, on constitutional and regulatory grounds, that they are entitled to such a hearing, and that they have a right to be so informed. Because it is apparent that federal regulations offer plaintiffs a greater likelihood of success, I will resolve this issue on nonconstitutional grounds.

### 1. *The Contentions*

Plaintiffs assert a right to a hearing based upon federal regulations codified at 42 C.F.R. §§ 431.200–431.250. Relying on the interpretation of similar regulations advanced primarily [8] in *Budnicki v. Beal,* 450 F.Supp. 546 (E.D.Pa.1978), plaintiffs contend they are entitled to a hearing, not to contest the *wisdom* of copayment, but to challenge the *application* of copayment in various factual contexts.

Defendants contest plaintiffs' entitlement to a hearing under the regulations. Defendants argue that the regulations specifically exclude from the hearing requirement across-the-board changes in medicaid benefits such as the imposition of copayment. Moreover, defendants contend, disputes over the application of copayment take place between recipients and *providers.* Requiring such disputes to be resolved in a state administrative hearing to which the provider is not a party, defendants conclude, would force resolution of recipient/provider disagreements in an inappropriate forum.

### 2. *Discussion*

The regulations at issue in this case were formulated to implement the Social Security Act's mandate that state medicaid plans "provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness...." 42 U.S.C. § 1396a(a)(3). The regulations do not limit their reach to a state agency's treatment of a particular medicaid claim; the fair hearing rules "pre-

scribe[] procedures for an opportunity for hearing if the Medicaid agency takes action to suspend, terminate, or reduce services." 42 C.F.R. § 431.200. Analogous regulations under the AFDC program have been held valid and binding on participating states as a "valid exercise of the Secretary's rulemaking authority...." *Rochester v. Baganz,* 479 F.2d 603, 605 (3d Cir. 1973). *See also Serritella v. Engelman,* 462 F.2d 601 (3d Cir.1972). In interpreting such regulations, several courts have ruled that, while a legislative decision that adversely affects medicaid recipients is beyond the review of administrative agencies, fair hearings must be accorded recipients who challenge the factual basis for a particular application of an across-the-board change. *See, e.g., Budnicki v. Beal, supra; Becker v. Toia, supra.*

Nevertheless, it must be conceded that the question raised by defendants' arguments is an open one in this circuit. *Eder v. Beal,* 609 F.2d 695, 700 n. 10 (3d Cir. 1979). Moreover, consideration of defendants' arguments in light of the Supreme Court's teaching in *Blum v. Yaretsky,* 457 U.S. 991, 102 S.Ct. 2777, 73 L.Ed.2d 534 (1982), and the structure of the fair hearing regulations demonstrates that defendants' proposed interpretation is not without appeal.

Initially, careful review of the regulation that denies fair hearings with respect to issues of federal and state law reveals that the disputed provision is ambiguous. Section 431.220(b) provides that a medicaid "agency need not grant a hearing *if the sole issue is a Federal or State law* requiring an automatic change adversely affecting some or all recipients." (emphasis added). As written, the regulation is an incomplete expression. A provision of state or federal law cannot itself *be* an "issue." Rather, depending on the proper interpretation of the regulation, a medicaid agency may deny a hearing "if the sole issue is"

---

**8.** Other cases relied upon by plaintiffs include: *Philadelphia Welfare Rights Organization v. O'Bannon,* Medicare & Medicaid Guide (CCH) ¶ 30.058 (E.D.Pa.1979) and *Becker v. Toia,* 439

F.Supp. 324 (S.D.N.Y.1977). *See also Becker v. Blum,* 464 F.Supp. 152, 156–57 & n. 5 (S.D.N.Y. 1978).

the *wisdom* of "a Federal or State law ...," or, given a more expansive reading, "if the sole issue is" the *application* of "a Federal or State law ..." to a given set of facts. The parties' arguments with respect to the interpretation of § 431.220(b) thus boil down to a dispute over which modifying phrase best accords with the purpose of the regulation.

On this point, defendants argue that the disputes plaintiffs seek to have resolved through a fair hearing are between recipients and providers, and that the mechanism of a state agency hearing (to which the provider is not a party) is not the appropriate forum for adjustment of such disputes. To buttress this argument, defendants rely on the Supreme Court's holding that a provider's judgment as to the level of care required by medicaid recipients is not conduct for which the state is responsible. *Blum v. Yaretsky, supra.*

The structure of the fair hearing regulations also lends some support to defendants' position. The stated purpose of the regulations is to provide "procedures for an opportunity for hearing if *the Medicaid agency* takes action to suspend, terminate, or reduce services." 42 C.F.R. § 431.200 (emphasis added). Arguably the only "action" taken by DPW was its adoption of copayment. Furthermore, the regulations provide that if, after the state provides timely notice, the recipient requests a hearing before the date of action, "the agency may not terminate or reduce services until a decision is rendered after the hearing ... [with certain exceptions]." 42 C.F.R. § 431.230(a). The application of the maintenance of benefits provision to copayment disputes need not be decided here because of my resolution of the other issues and the procedural posture of this case. But, the import of that requirement, considered in relation to the remainder of the regulatory scheme, strongly suggests that the fair hearing rules were designed to resolve medicaid disputes between recipients and the state agency.

On the other hand, there is much to be said for plaintiffs' position. Primarily, the level of responsibility necessarily borne by DPW for provider copayment decisions distinguishes this case from *Blum v. Yaretsky.* With few exceptions, provider application of copayment involves only the determination of whether and how much DPW regulations require a recipient to contribute for a given service. The professional decision as to the medical care required by a recipient is a *fait accompli* at the time the provider applies copayment; in making the assessment, the provider's function is simply one of accounting in accord with the mandate of state law.

Moreover, consideration of the purpose and practical operation of the fair hearing regulations furnishes some support for plaintiffs' interpretation. While the regulations permit state agencies to refuse hearings on "automatic" reductions in benefits, "even an across-the-board change in a program may give rise to factual questions in the application of that change to individual recipients...." *Budnicki v. Beal,* 450 F.Supp. 546, 552 (E.D.Pa.1978). The testimony in this case, particularly that of Ms. Spyker, illustrates that implementation of recipient cost-sharing will not be free of interpretive difficulties. For DPW to deny administrative hearings the only purpose of which is to settle disputes over the appropriate copayment for specific, medically indicated treatment, would leave final interpretation of medicaid regulations in the hands of individual providers.

It should be noted that the regulations interpreted in *Budnicki* specifically excluded issues of "incorrect grant computation" from the category of issues with respect to which the state could deny a hearing. For example, 42 C.F.R. § 205.10(a)(5) provided in part:

A hearing need not be granted when either State or Federal law require [sic] automatic grant adjustments for classes of recipients *unless the reason for an individual appeal is incorrect grant computation.*

*Budnicki,* 450 F.Supp. at 553 (emphasis added).

In short, the question whether recipients are entitled to hearings to contest particular applications of copayment is a difficult one. The evidence thus far presented has not been sufficient to establish the range of issues that might usefully be considered in such a proceeding. In view of my conclusion that plaintiffs have not shown that continued enforcement of copayment will cause irreparable harm, I will defer resolution of this issue until final hearing.

### C. *Failure to Provide Notice*

Finally, plaintiffs advance their case on the merits on the ground that DPW failed to provide notice of copayment to recipients who receive their medical assistance eligibility cards on a quarterly, as opposed to monthly, basis. In support of that contention, plaintiffs refer to an internal DPW memorandum stating that recipients received notice about copayment with their August, 1984 medicaid cards and the testimony of plaintiff Viola Sanders, a quarterly recipient who testified that she received no notice of the imposition of copayment.

Were I persuaded of the accuracy of plaintiffs' contention, I might well have reached a different result. I need not make that determination, however, because I conclude that the current record does not demonstrate a likelihood of success for plaintiffs on this issue. The statement made in DPW's internal memorandum is equivocal. It states only that those recipients who received medicaid cards in August received a copayment notice at that time. It does not mention whether other recipients received advance notice of copayment. In addition, other more specific statements in the record, particularly the testimony of defendant Radke, establish that DPW sent notice to all recipients through the June, 1984 mailing. I am satisfied, at least at this stage of the proceedings, that DPW provided timely notice of the institution of copayment.[9]

### VII. *Conclusion*

I conclude that plaintiffs' motion for a preliminary injunction must be denied. Plaintiffs have not shown that continued enforcement of recipient copayment will subject affected persons to a risk of irreparable harm. At final hearing I will determine whether, and under what circumstances, federal medicaid regulations guarantee recipients a hearing with respect to the application of copayment. I will also determine, if plaintiffs prevail, the appropriate form of relief.[10]

---

**9.** Because I have concluded that plaintiffs have not established irreparable harm, I need not consider the burden to the defendants of the relief requested. In addition, I note that considerations of public welfare do not demonstrably tilt the balance of equities.

**10.** Although I have not granted plaintiffs' request for a preliminary injunction, if plaintiffs were correct in their contention that recipients who receive their medicaid eligibility cards quarterly were not notified of the imposition of copayment, there can be little excuse if DPW now fails to provide notice without delay.